179 N.J. Super. 105 (1981)
430 A.2d 944
FRANK W. GREEN, JOHN E. GREEN AND MARGARET M. FOX, TRUSTEE, PLAINTIFFS,
v.
EVESHAM CORPORATION, MIDLANTIC NATIONAL BANK, ET AL., DEFENDANTS, AND MIDLANTIC NATIONAL BANK, THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
CHICAGO TITLE INSURANCE COMPANY, THIRD-PARTY DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 6, 1981.
Decided May 1, 1981.
*106 Before Judges SEIDMAN, ANTELL and LANE.
Thomas S. Jackson, a member of the Washington, D.C. bar admitted pro hac vice, argued the cause for third-party defendant-appellant Chicago Title Insurance Company (Davis & Reberkenny, attorneys; William D. Hogan, on the brief).
William D. Grand argued the cause for third-party plaintiff-respondent Midlantic National Bank (Greenbaum, Greenbaum, Rowe & Smith, attorneys).
The opinion of the court was delivered by ANTELL, J.A.D.
The question on this appeal is whether a mortgage lender suffered loss or damage recoverable under a mortgagee title insurance policy because of an overlooked prior recorded encumbrance, *107 where it is not shown that the mortgaged property was thereby reduced in value to less than the balance of the underlying debt or that, because of the prior lien, the lender failed to recover the full amount of the debt.
On February 6, 1973 Evesham Corporation, William Seltzer and Vivian Seltzer, his wife, executed a note and mortgage in favor of the predecessor to third-party plaintiff Midlantic National Bank (Midlantic) to secure a $15,000,000 construction loan. The mortgage covered a 2,000-acre tract located in Bedford and Evesham Townships. Closing took place on the basis of a report of title prepared by a wholly-owned subsidiary of third-party defendant Chicago Title Insurance Company ("Chicago") and the title policy, backdated to February 9, 1973, was issued by Chicago in April 1976. Overlooked in the report and not excepted from coverage in the policy was a mortgage recorded June 7, 1971, given to Frank W. Green, John E. Green and Margaret M. Fox, Trustee, covering 33 acres of the lands in question to secure repayment of $60,000. As part of the closing transaction the mortgagee paid $6,709,856 to the borrowers as a cash advance and in addition paid off six encumbrances shown by the report of title. The title policy issued by Chicago insured the mortgagee against "loss or damage" incurred by the insured by reason of, among other things, "[t]he priority of any lien or encumbrance over the lien of the insured mortgage."
On February 6, 1979 the Midlantic mortgage loan went into default. Advances thereunder then totalled $13,700,000. This action was instituted on March 31, 1976 by the filing of a complaint in foreclosure of the Green mortgage on a payoff balance of $51,042.95. As a subsequent mortgagee, Midlantic was served with the Green complaint on May 4, 1976 and its third-party complaint against Chicago was filed March 1, 1977. The third-party complaint was severed on May 6, 1977 and the Green foreclosure action thereafter proceeded to judgment, which was entered August 25, 1977.
Midlantic's requests of Chicago to discharge the Green mortgage were refused by Chicago.
*108 Although its own mortgage was in default, Midlantic determined not to foreclose. Instead, on December 23, 1976 it took a deed to the entire tract in lieu of foreclosure from Evesham Corporation and the Seltzers. In return it released the grantors from liability under the February 6, 1973 note and mortgage, paid the sum of $303,207.79, consisting of $100,000 to Evesham and the Seltzers and $203,207.79 to creditors of Evesham. Midlantic also paid $215,813.63 to Evesham and Medford Townships for delinquent real estate taxes and $28,973.38 to discharge another mortgage on the sewer plant site. As part of the transaction Midlantic also conveyed 185 acres of the mortgaged premises to the National State Bank and Girard Bank in return for the discharge of their subsequently recorded mortgages. At the time of taking the deed in lieu of foreclosure $13,680,982.92 was owing on Midlantic's mortgage plus interest in the amount of $1,409,568.90. The appraised value of the property was then $19,143,500.
It is to be noted that the foregoing events all transpired before Midlantic field its third-party complaint against Chicago.
At the sheriff's sale conducted February 23, 1978 under the Green foreclosure judgment Midlantic successfully bid against Chicago for the 33 acres and took a sheriff's deed for that parcel upon payment of $140,100. Of this sum, $59,615.36 was paid to the sheriff and the remainder credited to Midlantic.[*]
In rejecting Chicago's contention that Midlantic had not sustained a loss, the trial judge rested on three propositions: (1) the "value of the remaining security is irrelevant," (2) the "insured *109 is entitled to all the security for which it bargained" and (3) the measure of damages "is the cost of removing the lien." Thereupon he entered judgment on November 7, 1979 in favor of Midlantic and against Chicago in the amount of $82,571.48. Of this, $59,615.36 was allocated to the cost of removing the lien by purchasing the sheriff's deed, interest of $7,956.12, and a counsel fee of $15,000.
In reasoning as he did the trial judge conceived that he was governed by Caravan Products Co. Inc. v. Ritchie, 55 N.J. 71 (1969). In that case a purchaser took title to property based on a preliminary report of title which missed an unconfirmed municipal assessment for $6,900. While our Supreme Court in that case did allow to plaintiff a recovery for the amount required to remove the assessment, that title policy insured the interest of a real estate owner, not a mortgagee. The distinction is significant. The fee interest of an owner is immediately diminished by the presence of a lien thereon since its resale value will always reflect the cost of removing the lien. It is otherwise with a mortgage lender whose loss cannot be measured unless the underlying debt is not repaid and the security of the mortgage proves inadequate. To say that the loss here consisted of the diminution in the security misses the point that the diminished security is now supplied by the title policy, but only to the extent that there has been a debt loss which remained unsatisfied from the proceeds of the mortgaged property. By requiring the insurer to pay now for the cost of removing the lien merely creates the conditions for a windfall should the debt be repaid or should the remaining lands provide sufficient security for payment.
It is settled that a title insurance policy is a contract of indemnity under which the insurer agrees to indemnify its insured in a specified amount against loss through defects of title to, or liens or encumbrances on, realty in which the insured has an interest. Caravan Products Co. Inc. v. Ritchie, supra at 74; Sandler v. New Jersey Realty Title Ins. Co., 36 N.J. 471, *110 478-79 (1962). While no New Jersey decision specifically addresses the question here presented, cases from other jurisdictions lend support to our views.
In Pennsylvania Co. for Insurances, etc. v. Central T. & S. Co., 255 Pa. 322, 99 A. 910 (Sup.Ct. 1917), plaintiff mortgagee obtained a policy insuring plaintiffs against "actual loss or damage" sustained because of noncompletion of premises. Following default by the mortgagor, the mortgagee performed certain completions and called upon the insurer to pay the cost thereof. Prior to doing so the mortgagee had released three of the houses covered by the mortgage from the lien of the mortgage, and the insurer contended that since this deprived it of its right of subrogation under the policy it was not bound to its obligations thereunder. In discussing the rights of the parties in this context the court stated (at 911) that the policy was in the form of an ordinary title insurance policy with appropriate provisions to cover loss or damages sustained by reason of noncompletion of the premises. It observed that "[t]he contract is one of indemnity, and plaintiff is bound to show actual loss sustained before there can be a recovery." The jury, it was noted, had found in plaintiff's favor in the amount of $1,000. The court then reviewed the options open to plaintiff in the case of noncompletion in the following language:
On failure of the contractor to complete, two courses were open to plaintiff; he could either notify defendant of the situation and do nothing further, relying on his insurance policy to protect him against ultimate loss when the period of payment of the mortgage arrived, or, if his contract with the owner permitted, he might complete the premises in order to minimize his loss and call upon defendant to reimburse him for damages suffered, if any. If sale had been made under foreclosure proceedings, and, because of the unfinished condition of the buildings, the properties were purchased by a third person at a sum insufficient to meet plaintiffs' claim, the measure of damage would be fixed.
The court continued its discussion as follows:
The testimony is conflicting as to whether or not there was actual loss or depreciation in the value of the mortgage, owing to failure to complete the houses. Defendant contends sufficient equity remained in the properties released from the mortgage to cover the actual loss sustained and witnesses for plaintiff valued the properties at $2,200 and $4,000, the first mortgages thereon being respectively $1,400 and $2,500. The properties, however, were duly taken *111 into consideration by the experts who testified to the amount of depreciation in value of the mortgage, so that defendant really obtained whatever benefit was to be derived from them. In submitting the case to the jury the trial judge clearly stated there could be no recovery if no actual loss or damage was sustained by the holder of the mortgage, and affirmed defendant's seventh point, to the effect that defendant did not undertake that the house would be actually completed, and if the mortgage was worth par, even though the buildings were not completed, there could be no recovery, by saying that if the ground alone was equal in value to the face of the mortgage, the verdict must be for defendant.
........
The contract of the latter was not to insure completion, but to indemnify the former against loss under the mortgage by reason of noncompletion. If the mortgage, notwithstanding such noncompletion, was worth its face value, no loss was sustained. [at 912]
In Diversified Mtg. Investors v. U.S. Life Ins. Co., 544 F.2d 571 (2 Cir.1976), plaintiff-mortgagee had sought an order requiring defendant title insurance company to discharge certain prior unreported mechanics' liens. This had been demanded previously of the insurer, as Midlantic did here. The application was denied by the District Court and its action was appraised by the Circuit Court of Appeals in the following language:
On the facts submitted to him by affidavit, the District Judge was correct in refusing to order USL [the insurer] to discharge the mechanic's liens. A title insurance policy is a contract of indemnity, not of guaranty. Such a policy entitles the insured to indemnity only to the extent that its security is impaired and to the extent of the resulting loss which it sustains. 45 C.J.S. Insurance § 969 at 1162 (1946); 13 Couch on Insurance 2d § 48:108 at 582 (1965); Annot. 60 A.L.R.2d 972, 976 (1958); Grimsey v. Lawyers Title & Ins. Corp., 38 A.D.2d 572, 328 N.Y.S.2d 474 (2d Dep't 1971) (mem.), modified on other grounds, 31 N.Y.2d 953, 341 N.Y.S.2d 100 [293 N.E.2d 249] (1972) (mem.); Goode v. Federal Title & Ins. Corp., 162 So.2d 269 (Fla.App. 1964); Ring v. Home Title Guaranty Co., 168 So.2d 580 (Fla.App. 1964); Sattler v. Philadelphia Title Ins. Co., 192 Pa.Super. 337, 162 A.2d 22 (1960); Wheeler v. Equitable Trust Co., 221 Pa. 276, 70 A. 750 (1908). Because there are unresolved issues as to the value of the mortgaged property and the priority and provability of liens, determination of the extent of the insurer's obligation must await trial. [at 574-575, n. 2]
In First Commerce Realty Investors v. Peninsular Title Ins. Co., 355 So.2d 510 (Fla.App. 1978), it was shown that a mortgagor in default did not have title to part of the property which it had mortgaged to plaintiff. At the foreclosure sale, however, the remaining property proved sufficient to satisfy the underlying debt. Plaintiff then brought suit against its title insurer for *112 the diminution in its security and the court explained its affirmance of the judgment for defendant in the following language:
The value of the property at the time First Commerce acquired it, according to First Commerce's own evidence, was in excess of both the amount of the mortgage and the maximum insured interest. As a result, First Commerce can show no loss which entitles it to indemnification. The dominant characteristic of insurance is the granting of indemnity, or security against, loss for a stipulated consideration. Brock v. Hardie, 114 Fla. 670, 154 So. 690 (1934). [at 511]
The rationale of the foregoing cases is compatible with the principles applied by New Jersey cases dealing with claims on fire insurance policies. In Power B. & L. Ass'n v. Ajax Fire Ins. Co., 110 N.J.L. 256 (E. & A. 1932), the mortgagee foreclosed on the mortgaged property and purchased it at a sheriff's sale after it had been damaged by fire. Thereafter it sought recovery from the insurer for the fire loss. The claim was rejected because plaintiff had not shown whether the proceeds of the sheriff's sale were enough to satisfy the mortgaged debt, "a vital factor in the case." Id. at 258. The court explained its position in the following language:
... [I]f the sale brought enough to pay the plaintiff's debt in full, that wiped out any liability on the part of the insurance company, for, clearly, the plaintiff could not recover at the foreclosure suit the full amount of its mortgage, thereby having the debt for which the mortgage was given as security entirely satisfied, and then in addition recover from the insurance company the amount of money provided for in the policy. In other words, after the foreclosure sale and the satisfaction of the plaintiff's debt, it ceased to have any interest as mortgagee in the premises covered by the policy. As the stipulated state of facts does not contain any statement with relation to this situation, the plaintiff's case falls; for, in order to be entitled to recover, the burden rested upon it to show that the foreclosure sale did not produce enough to satisfy the mortgage in full, and that the mortgage debt still remained unsatisfied at least in part. If it had been satisfied in full, then, as has already been indicated, it has no cause of action on the policy. If it has been satisfied in part, then to the extent that the mortgage has been reduced by the purchase money received at the sheriff's sale, the insurance company's liability has also been reduced proportionately. [at 258].
Also see Tauriello v. Aetna Ins. Co., 14 N.J. Super. 530 (Law Div. 1951).
What emerges is that where a fire policy insures against "loss," recovery will not be allowed for fire damage to security given for a loan unless by reason thereof the loan remains unpaid. Furthermore, where the lender purchases the property *113 at a sheriff's sale at a price sufficient to satisfy the debt it ceases to have any interest in the property as a mortgagee. These propositions are no less viable where the claim arises under a title policy or where the debt is satisfied by taking a deed in lieu of foreclosure.
We find nothing in the record before us to suggest that Midlantic sustained a loss. Because it did not seek foreclosure of its mortgage it is unknown what the property would have brought at a sheriff's sale. The appraisal of December 30, 1976, when Midlantic took the deed in lieu of foreclosure, shows the value of the remaining lands to be $19,143,500, which is well in excess of the $15,111,063.90 due on its loan. If doubts remain as to whether the value of the remaining property exceeded the balance due on the loan, they are surely put to rest by the terms of the deed in lieu of foreclosure transaction whereby Midlantic released the mortgagors fully from the balance of the debt, paid out an additional approximate amount of $550,000 and conveyed to subsequent mortgagees 185 acres of the lands in question.
Reversed and remanded to the trial court for the entry of judgment in favor of the third-party defendant on the third-party complaint.
NOTES
[*] It is unclear why the parties chose to bid as they did. It appears that outside bidders dropped out at $70,000 and it was then that Chicago entered the bidding at $71,000. Midlantic's representative then asked whether Chicago would, if it were successful bidder, deed the property to Midlantic for no consideration. When he was told that it would not the bidding continued. Chicago explains that it participated on the basis of an appraisal which valued the 23 acres at the $140,000 paid by Midlantic, although the testimony is that the Midlantic representative stated that he was instructed to bid as high as $15,000,00 to acquire the property.