[No. C005350. Third Dist. Nov. 19, 1990.]

GEORGE G. CALE, Plaintiff and Appellant, v.
TRANSAMERICA TITLE INSURANCE, Defendant and
Respondent.

COUNSEL

Paul H. Greisen for Plaintiff and Appellant.

Atwood, Knox & Anderson, Stanford H. Atwood, Jr., and Kevin L. Anderson for Defendant and Respondent.

OPINION

PUGLIA, P. J.—Plaintiff George G. Cale complained against defendant Transamerica Title Insurance (Transamerica) for "tortious breach of insurance contract" in refusing to indemnify him under a policy of title insurance. The trial court granted Transamerica's motion for summary judgment. We shall affirm.

Cale loaned $8,000 to Stewart, Wolridge and Smith, the owners of a Sacramento townhouse (the property). The borrowers gave Cale their note for $8,000 secured by a second deed of trust on the townhouse which Cale recorded on March 3, 1987. Cale simultaneously purchased from Transamerica a title insurance policy to protect his secured interest in the property. The policy excepted from coverage a first deed of trust securing an indebtedness of $24,700 to Homestead Savings. Transamerica failed to disclose and therefore to except from coverage three other liens senior to Cale's deed of trust.

The borrowers defaulted on the $8,000 note. Cale first became aware of the three undisclosed senior liens in May 1987 when he received a trustee's sale guaranty report in anticipation of nonjudicial foreclosure under his trust deed. The liens were: (1) a $1,374 abstract of judgment against Stewart; (2) a $192 lien in favor of the homeowners association and (3) a $1,927 lien against Stewart in favor of the Internal Revenue Service.

In September 1987, Cale advised Transamerica of the three undisclosed senior liens and made claim under the title insurance policy for $4,885—the cost, including interest and expenses, of removing them. Transamerica conceded its failure to disclose the liens and, in a letter to Cale's attorney explained: "it is Transamerica's position that your client's loss (if any) cannot be determined until he has completed nonjudicial foreclosure proceedings against the subject property. It is possible that sufficient proceeds will be realized from that sale to discharge the liens in question."

In November 1987, Cale foreclosed under the deed of trust and purchased the property at the trustee's sale for $1, subject to the senior liens.

Transamerica continued to refuse payment of Cale's claim, maintaining that as the current owner of the property Cale had not yet sustained an indemnifiable loss as a result of the three undisclosed senior liens. Cale thereupon filed the instant complaint for damages.

The complaint alleges that Transamerica promised to indemnify Cale against loss to his insured interest caused by undisclosed senior liens; and that Cale foreclosed on the lien of his deed of trust but the foreclosure sale proceeds were insufficient to discharge any part of his secured $8,000 loan. The answer alleges affirmatively the undisclosed senior liens have not caused any actual loss to Cale and thus no duty to indemnify has arisen under the policy.

Cale's title insurance policy indemnifies the insured "against loss or damage not exceeding the amount of insurance stated in Schedule A [$8,000] and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by reason of: . . . Priority of any lien or encumbrance over the lien of the insured mortgage, said mortgage being shown in Schedule B in the order of its priority . . . ." The policy contains the following exception to coverage: "This policy does not insure against loss or damage, nor against costs, attorneys' fees or expenses, any or all of which arise by reason of the following: . . . Defects, liens, encumbrances, adverse claims, or other matters . . . (c) resulting in no loss or damage to the insured claimant."

The policy further states: "(a) The liability of the Company under this policy shall in no case exceed the least of: (i) the actual loss of the insured claimant; or . . . (iii) if this policy insures the owner of the indebtedness secured by the insured mortgage, and provided said owner is the insured claimant, the amount of the unpaid principal of said indebtedness, plus interest thereon, provided such amount shall not include any additional principal indebtedness created subsequent to Date of Policy, except as to amounts advanced to protect the lien of the insured mortgage and secured thereby."

Finally, the policy states: "If this policy insures the owner of the indebtedness secured by the insured mortgage, this policy shall continue in force as of Date of Policy in favor of such insured who acquires all or any part of the estate or interest in the land described in Schedule A by foreclosure, [or] trustee's sale . . . ."

■ "Title insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance

affecting title, occurs. [Citations.] [¶] Accordingly, when the contingency insured against under the policy occurs, the title insurer is not, by that fact alone, liable to the insured for damages in contract or tort, but rather is obligated to indemnify the insured under the terms of the policy. When the policy insures the lien of a deed of trust and the insured lien is junior to a lien undisclosed but insured against by the policy, the compensable loss is limited by the terms and conditions of the policy." (*Lawrence* v. *Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70, 74-75 [237 Cal.Rptr. 264]; compare Ins. Code, §§ 12340.1, 12340.2 with §§ 12340.10, 12340.11.)

■ There is a fundamental distinction between the indemnifiable loss of an insured lender and the indemnifiable loss of an insured owner of property by virtue of title defects or undisclosed liens. In *CMEI, Inc.* v. *American Title Ins. Co.* (Fla. Dist. Ct. App. 1984) 447 So.2d 427, an insured mortgagee who had acquired title to the secured property by foreclosure made a title insurance claim regarding an undisclosed defect in title. In granting summary judgment for the insurer, the court stated: "[W]hile a title insurance policy insuring the interest of a real estate owner and a title insurance policy insuring the interest of a mortgagee are both contracts of indemnity, under which the insurer agrees to indemnify the insured up to a specific amount against loss or damage resulting from liens, encumbrances or title defects and claims within its coverage, nevertheless, substantive differences between the insured interest of an owner and that of a mortgagee results [*sic*] in a significant difference in what constitutes 'loss or damage' under each type of title policy. Title defects and liens directly and adversely affect the property owner because the owner is entitled to the full market value of the property and that value is immediately reduced by outstanding title defects and liens. A mortgagee's loss is measured by the extent to which the insured debt is not repaid because the value of security property is diminished or impaired by outstanding lien encumbrances or title defects covered by the title insurance. *Therefore, superior liens or title defects in claims may exist which reduce the market value of the security property (the value to the owner) yet result in no loss or damage to the insured mortgagee* because the effect of the title problems does not reduce the value of security property below the amount of an indebtedness secured or *because the indebtedness is otherwise secured or paid.* [¶] *This mortgagee policy provides that if the mortgagee acquires the security property by foreclosure, or in satisfaction of the indebtedness, the policy will continue in force subject to all of its conditions and stipulations.* However, contrary to appellant's contentions, this language is inadequate to convert this mortgagee title policy into a standard owner's title policy when the insured mortgagee becomes the owner of the land by foreclosure. In substance the policy continues to provide the same coverage as before subject to all policy conditions and stipulations." (At p. 428, italics added.)

Similarly, Cale's lender policy continued uninterrupted even after he took title through foreclosure. As pointed out in *CMEI Inc.* v. *American Title Insurance Co., supra*, it has not been converted into a standard owner's policy. "To say that the loss here consisted of the diminution of the security misses the point that the diminished security is now supplied by the title policy, but only to the extent that there has been [an insured] debt loss [by reason of the undisclosed defect] which remained unsatisfied from the proceeds of the mortgaged property." (*Green* v. *Evesham Corp.* (1981) 179 N.J.Super. 105 [430 A.2d 944, 946].) Title insurance indemnifies a lender only against loss with respect to the secured indebtedness, not a diminution of profits potentially obtainable from resale of the property. (*Lawrence, supra,* 192 Cal.App.3d at p. 74, fn. 3.)

In its motion for summary judgment, Transamerica argued Cale had not suffered an indemnifiable loss under the policy because: (1) the undisclosed senior liens might not be valid and enforceable and (2) Cale might be able to resell the property on the open market for a price sufficient to discharge the senior liens plus Cale's $8,000 loan. We need not discuss the validity of the senior liens because, assuming arguendo they are valid and enforceable, Cale has suffered no actual loss *by reason of* Transamerica's failure to disclose and except those liens from coverage. Cale now owns the property which secured his $8,000 loan and Transamerica under the policy continues to insure against loss or damage by reason of the undisclosed senior liens not excepted from coverage.

As the party moving for summary judgment, Transamerica had the burden of setting forth competent evidence sufficient to negative an essential element of Cale's cause of action for breach of contract. (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 638-640 [177 Cal.Rptr. 445].) Transamerica met its burden by proffering facts establishing prima facie that Cale had suffered no actual loss. Specifically, Transamerica's moving papers averred the following undisputed facts: (1) Cale obtained title to the property for $1 through the trustee's foreclosure sale when nobody else bid on the property; (2) Cale still owned the property subject to the senior liens; (3) Cale had not expended money to remove the undisclosed senior liens; (4) none of the undisclosed senior lienors had demanded payment; and (5) Transamerica continued to provide coverage for loss on account of the undisclosed senior liens.

The burden having shifted to Cale (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203]), he failed to set forth in his opposition any material facts disputing Transamerica's showing that he had suffered no actual loss by reason of the undisclosed senior liens. Instead, Cale's opposing papers focus solely on the issue of the

value of the property, asserting that the trustee's sale at which he bought the property for $1 subject to the outstanding senior liens established the value of the property as a matter of law. (*Smith* v. *Allen* (1968) 68 Cal.2d 93, 95-96 [65 Cal.Rptr. 153, 436 P.2d 65]; *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 606-607 [125 Cal.Rptr. 557, 542 P.2d 981].)[1] However, the value of the property in the hands of the foreclosing insured lender is not the measure of loss under the terms of the policy. Although fair market value may provide inadequate security for Cale's lien, his insured indebtedness continues to be secured against loss by the terms of the title insurance policy. (*CMEI* v. *American Title, supra*, 447 So.2d at p. 428; *Green* v. *Evesham, supra*, 430 A.2d at p. 946.) If one of the senior lienors were to foreclose, or if Cale were to sell the property on the open market, he might then suffer an indemnifiable loss under the policy, but only to the extent the proceeds of sale otherwise available to discharge Cale's lien are required instead to discharge any of the undisclosed senior liens. ▪▪▪ ▪ Because Cale did not raise a triable issue of fact regarding loss, summary judgment was properly granted for Transamerica. (Code Civ. Proc., § 437c, subd. (c).)[2]

The judgment is affirmed.

Carr, J., concurred.

**SIMS, J.**—I respectfully dissent.

Transamerica advised Cale that his loss could not be determined until he completed nonjudicial foreclosure proceedings. Cale did what Transamerica requested. His foreclosure left him with the extinguishment of his lien, the elimination of further remedies to collect his note, and property nobody else was willing to buy. Transamerica then told him he was still not damaged.

I think Transamerica was right the first time. For reasons that follow, I believe the foreclosure sale made out a prima facie case of damage and loss to Cale which was unrebutted on summary judgment, so that the summary judgment was erroneously granted.

---

[1] *Smith* and *Cornelison, supra,* hold a nonjudicial foreclosure sale under the statute is determinative of the value of the property as between the lender and borrower under a deed of trust. (Civ. Code, § 2924 et seq.) This rule, however, has no bearing on the question whether an insured lender has suffered an actual loss under the terms of a contract of title insurance.

[2] Cale noticed an appeal from the denial of his motion for summary adjudication of issues. While the order denying a motion for summary adjudication of issues is not appealable, it is reviewable upon appeal of summary judgment. (*Camarena* v. *Sequoia Ins. Co.* (1987) 190 Cal.App.3d 1089, 1100, fn. 2. [235 Cal.Rptr. 820].) Since we affirm the summary judgment for Transamerica, we have no occasion to consider the denial of Cale's motion for summary adjudication. The purported appeal therefrom is dismissed.

Cale contends he was damaged as of the time of the foreclosure sale, when he obtained no money to satisfy his lien. Cale correctly notes that his nonjudicial foreclosure extinguished his lien (Civ. Code, § 2910; *Ralph C. Sutro Co.* v. *Paramount Plastering, Inc.* (1963) 216 Cal.App.2d 433, 437-438 [31 Cal.Rptr. 174]) and barred further attempts to collect the underlying note. (See Code Civ. Proc., § 580d; *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 43 [27 Cal.Rptr. 873, 378 P.2d 97].) Because the foreclosure sale had no effect on prior liens (*Streiff* v. *Darlington* (1937) 9 Cal.2d 42, 45 [68 P.2d 728]; Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 1990) § 2.27, p. 90) any purchaser of the property would take title subject to the prior liens not disclosed by Transamerica, thereby decreasing the price a purchaser was willing to pay. In essence, Cale argues that, but for Transamerica's undisclosed liens, somebody would have bought the property, thereby generating cash to be applied at least in partial satisfaction of his secured note.

I think Cale's theory of damage is essentially correct. In my view, in order to show that Transamerica's undisclosed liens caused him loss or damage, Cale must prove at trial the following as of the date of foreclosure:

(1) That the value of the subject property was less than the total of Cale's lien plus all prior liens. This is so because if the value of the subject property, obtained at foreclosure, was sufficient to satisfy all liens, including Cale's, he would suffer no damage.

(2) That the value of the subject property (exclusive of all liens) was more than the amount of the disclosed first lien. If the value of the property (exclusive of all liens) did not exceed the amount of the disclosed first, then Cale would not have recovered on his lien even if Transamerica's undisclosed liens had not existed. Thus, Cale cannot make Transamerica pay for his bad investment judgment in securing his loan with a hovel whose value would not satisfy even the first lien.

Cale adequately pleaded these matters by alleging that, *as a consequence of Transamerica's undisclosed prior liens*, the equity in the subject property was made insufficient to secure or discharge Cale's note. The burden was therefore upon Transamerica (see *Pultz* v. *Holgerson* (1986) 184 Cal.App.3d 1110, 1114 [229 Cal.Rptr. 531]) to show that, at the time of the foreclosure sale, either (1) the value of the subject property was equal to or greater than all liens, including Cale's, or (2) the value of the property (exclusive of all liens) was less than the amount of the first.

We may make short shrift of requirement (2), because there was no evidence before the court, from any source, tending to show the value of the property was less than the first.

This leaves the question of the effect of the foreclosure sale. I think the foreclosure sale sufficiently established the value of the property was less than that necessary to satisfy Cale's lien. This is so for two reasons.

First, because the insurance policy fails to specify how "loss" or "damage" is to be calculated, the policy is to that extent ambiguous. "It is a basic principle of insurance contract interpretation that doubts, uncertainties and ambiguities arising out of policy language ordinarily should be resolved in favor of the insured in order to protect his *reasonable* expectation of coverage. [Citations.]" (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920], original italics.) Here, the policy was obtained expressly to insure a lien of a second deed of trust. That was the very purpose of the insurance, well known to Transamerica. In this context, both the insured and insurer would reasonably expect the upper value of the subject property to be set by a proper trustee's sale under the deed of trust, especially since " '[T]he purpose of the trustee's sale is to resolve the question of value and the question of potential forfeiture through competitive bidding . . . .' (Hetland, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) p. 255.)" (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 607 [125 Cal.Rptr. 557, 542 P.2d 981].) Moreover, allowing a proper trustee's sale to fix the upper limit of value would provide a clear standard to the industry, thereby avoiding the kind of dispute at issue here.

However, even assuming for the sake of argument Cale must show the *fair market value* of the property was less than the total of all liens as of the date of the foreclosure, and that fair market value is different from the value upon foreclosure (see *Rainer Mortgage* v. *Silverwood, Ltd.* (1985) 163 Cal.App.3d 359, 366 [209 Cal.Rptr. 294]),[1] the summary judgment was still erroneously granted. There was no evidence of the fair market value of the property at the time of foreclosure other than the one dollar Cale paid. Transamerica made no showing that the fair market value of the property was greater than the sum total of all liens.

Transamerica relies upon Cale's deposition, where he was asked, "[D]o you believe that if the property were now sold there would be insufficient money generated to pay you back all those amounts?" And Cale replied, "It is pretty close. Very close, I would say."

---

[1] It has been suggested that a *judicial* foreclosure sale does not establish the fair market value of property because (if a deficiency judgment is sought) the trustor has a year after the sale in which to redeem the property, thereby depressing its value on an otherwise open market. (See Code Civ. Proc., §§ 729.010-729.090; *Rainer Mortgage* v. *Silverwood, Ltd., supra,* 163 Cal.App.3d at p. 367.) However, "A trustee's sale is not subject to postsale redemption rights [citations] and will therefore often command a higher price from a third party, so that the creditor has a better chance of being paid in full . . . ." (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra,* § 2.3, p. 53.)

There are two problems with Transamerica's reliance on this testimony. First, it tenders no opinion of the value of the property *at the time of the foreclosure*, when Cale claims he was damaged. Cale's statement is evidence of value only at the time his deposition was taken in the ensuing lawsuit. An insurer cannot avoid paying an insured for damage or loss when it is incurred and escape its obligation by taking advantage of later appreciation in the value of real property. Second, even assuming the relevancy of the testimony, Cale testified only that the value of the property was then "very close." As has been said, "close" counts in horseshoes but not upon a summary judgment.

Various authorities relied upon by Transamerica and the majority are inapposite because, in each case, the value of the property obtained by the insured by foreclosure (or deed in lieu thereof) was shown to be sufficient to satisfy the insured's lien. (See *CMEI, Inc.* v. *American Title Ins. Co.* (Fla.App. 1984) 447 So.2d 427; *First Commerce Realty* v. *Peninsular Title Ins.* (Fla.App. 1978) 355 So.2d 510, 511; *Green* v. *Evesham Corp.* (1981) 179 N.J.Super. 105 [430 A.2d 944, 949].) No such showing has been made in this case. Similarly, in *Lawrence* v. *Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70 [237 Cal.Rptr. 264], the insureds were made whole when they actually resold the subject property and received additional payments from the insurer. (*Id.* at p. 73.) That has not happened here, either.

It is wholly immaterial that Transamerica continues to provide insurance against loss. Plaintiff has made a prima facie showing (insufficiently rebutted by Transamerica) that he was damaged and suffered loss when he foreclosed on the property. Transamerica cannot avoid its obligations under the policy by offering to continue to insure him.

The summary judgment should be reversed.