[No. G015266. Fourth Dist., Div. Three. July 31, 1997.]

BANK OF AMERICA, N.T. & S.A., Plaintiff and Appellant, v.
CHARLES QUACKENBUSH, as Insurance Commissioner, etc., Defendant
and Respondent.

## COUNSEL

Munger, Tolles & Olson, John C. Fauvre, Ullar Vitsut, James Roethe and Michael E. Soloff for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Carol H. Rehm, Jr., Deputy Attorneys General, Levinson & Kaplan and Robert A. Levinson for Defendant and Respondent.

## OPINION

**WALLIN, J.**—The Bank of America, N.T. & S.A. (the Bank), holder of financial guarantee bonds issued by an insolvent insurer, filed claims on the bonds with the Insurance Commissioner. The Bank sought to have the underlying security valued by appraisal, as provided in the Insurance Code,[1] even though it had previously made full credit bids on the security at a nonjudicial foreclosure sale. The commissioner determined that the full credit bids conclusively established the value of the security and extinguished the Bank's claims. The Bank filed an application in the trial court seeking to set aside the commissioner's determination, which was denied. The Bank appeals the trial court's denial; we affirm.

### Factual Background

The Bank's claims arise out of a fraudulent investment scheme carried on by National Mortgage Equity Corporation (NMEC) between 1982 and 1984. During that time, NMEC pooled thousands of loans that were secured by deeds of trust on residential properties and sold shares of the pool to investors. NMEC also offered financial guarantee bonds, issued by Glacier General Assurance Company (Glacier), to the pool investors as additional security. The bonds provided that Glacier would guarantee payment of the entire outstanding indebtedness if the borrower defaulted. NMEC grossly overvalued the residential properties, however, causing the loan amounts to greatly exceed the fair market value of the collateral. Consequently, all the loans went into default. Through a series of transactions, the Bank succeeded to the interest of the lender on the 81 Glacier-backed notes and deeds of trust at issue before us: 75 loans secured by condominium units in the Caballeros complex in Palm Springs, and 6 secured by various single family residences throughout California.

Glacier became insolvent due to the defaults of the thousands of financial guarantee bonds it had issued. The Insurance Commissioner was appointed

---

[1] All statutory references are to the Insurance Code.

the California conservator for Glacier, which was ordered liquidated in late 1985, and an injunction against interference with any of its assets was issued. The Bank filed individual claims with the commissioner, including the 81 bonds at issue here, and moved for relief from the injunction so it could foreclose on the 75 Caballeros properties, supporting its motion with appraisals showing the fair market value of the units was far less than the outstanding debt against the properties. The commissioner did not oppose and the trial court granted the motion. Subsequently, the commissioner and the Bank entered into an elaborate stipulation releasing the remaining six bonded properties, and agreeing that the fair market value was less than the outstanding indebtedness. Notwithstanding this agreement, the Bank agreed to account to the commissioner for the sale proceeds following foreclosure and to pay to the Glacier estate 50 percent of any proceeds in the unlikely event they were in excess of the Bank's indebtedness.

The Bank conducted nonjudicial foreclosure sales on the properties in 1987 and 1988. The preforeclosure sale appraisals showed the 81 properties were worth approximately $3.4 million; nevertheless, the Bank inexplicably entered full credit bids totaling $15 million and took title. It subsequently sold the properties for about $3 million, leaving it with a net loss roughly equivalent to the face amount of the bonds.

In July 1993, the commissioner issued its notice of rejection for each of the 81 individual claims based on the Bank's purchase of each property by full credit bid, asserting each purchase effectively exonerated the corresponding bond claim. The Bank filed an order to show cause with the trial court under section 1032. After briefing and argument, the trial court upheld the Commissioner's rejection of the claims, finding "the concept of a full . . . credit bid establishes pretty sound law. And in making my ruling in this matter I'm going to apply that to this case." The trial court also found sections 1029 and 1030 were inapplicable to the proceeding before it because the Bank was unsecured. "When they made that full credit bid they terminated any security in those trust deeds."

## Discussion

■ The full credit bid rule is well established in California law. (4 Miller & Starr, Cal. Real Estate (2d ed., 1997 pocket supp.) § 9:158, fn. 30, p. 134.) If a lender chooses to bid at a nonjudicial foreclosure sale, it can make a credit bid up to the amount of the outstanding indebtedness. If it makes a full credit bid (an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure) and acquires the property, ". . . the lender pays the full outstanding balance of the debt and costs of foreclosure to itself and takes title

to the security property, releasing the borrower from further obligations under the defaulted note." (*Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226, 1238 [44 Cal.Rptr.2d 352, 900 P.2d 601]; see also *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 606-607 [125 Cal.Rptr. 557, 542 P.2d 981].)

A full credit bid conclusively establishes the value of the property, extinguishes the lien, and precludes the lender from pursuing any other remedy based on the diminution of the value of the property. (4 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 9:158, p. 539.) This is so because by making a full credit bid, the lender has accepted the property as full payment of its debt and "any further payment would result in a double recovery." (*Alliance Mortgage Co.* v. *Rothwell, supra,* 10 Cal.4th at p. 1239; see also *Pacific Inland Bank* v. *Ainsworth* (1995) 41 Cal.App.4th 277, 281 [48 Cal.Rptr.2d 489].)

The full credit bid rule applies with full force in disputes between the lender and a third party, including an insurer. In *Universal Mortg. Co., Inc.* v. *Prudential Ins. Co.* (9th Cir. 1986) 799 F.2d 458, the lender was named beneficiary under a fire and casualty insurance policy covering the property securing the loan. The borrower defaulted and the notice of trustee's sale issued. The lender sent its agent to inspect the property, but he was unable to enter. Based on external observations, the agent described the property's condition as "good." At the sale, the lender made a full credit bid; subsequently, it discovered damage inside the building and recovered about $15,000 less than its bid on resale.

The lender acknowledged the full credit bid rule, but sought an exception "when the loss payable mortgagee has no actual or constructive knowledge of a loss at the time of a full credit bid." (799 F.2d at p. 460.) The court rejected the lender's position, stating, "Actual or constructive knowledge of property damage prior to a full credit bid is irrelevant because the full credit bid, once made, extinguishes the debt secured by the insurance policy." (*Id.* at p. 461; see also *Altus Bank* v. *State Farm Fire and Cas. Co.* (C.D.Cal. 1991) 758 F.Supp. 567.)

The Bank claims *Karl* v. *Commonwealth Land Title Ins. Co.* (1993) 20 Cal.App.4th 972 [24 Cal.Rptr.2d 912] stands for the proposition that actual market value rather than a foreclosure sale price should be used to value security between lenders and their insurers. But *Karl,* a title insurance case in a completely different context, explained that title insurance is a contract of *indemnity* rather than *guaranty.* It held an indemnifiable loss occurs on the date of foreclosure and the relevant value is the fair market value as of that date, not the price realized at a later sale. (*Id.* at p. 983.)

*Cale* v. *Transamerica Title Insurance* (1990) 225 Cal.App.3d 422 [275 Cal.Rptr. 107], another title insurance case, also equated the secured lender's loss with fair market value. But neither *Cale* nor *Karl* involved a full credit bid, and both are confined to the title insurance arena.[2] As *Cale* acknowledged, the rule that a nonjudicial foreclosure sale is determinative of the value of the property as between the lender and borrower under a deed of trust "has no bearing on the question whether an insured lender has suffered an actual loss under the terms of a contract of title insurance." (*Cale* v. *Transamerica Title Insurance, supra,* at p. 428, fn. 1.)

The most recent case from our Supreme Court on the full credit bid rule is *Alliance Mortgage Co.* v. *Rothwell, supra,* 10 Cal.4th 1226, holding the full credit bid does not necessarily preclude an action by the lender to recover fraud damages from a third party. In *Alliance,* the lender alleged the defendants had conspired to induce it to make loans for amounts in excess of the values of the properties by fraudulent misrepresentations. The fraud was not discovered until after the foreclosure sales, at which the lender made full credit bids. The court held, "[T]o the extent defendants made fraudulent misrepresentations on which Alliance justifiably relied in making its full credit bid, they cannot assert the full credit bid rule as a defense to Alliance's fraud claims." (*Id.* at p. 1246, fn. 8.) The measure of damages for fraud is not based on the impairment of security, but on the damages caused by the fraud.

■ *Alliance* does not further the Bank's position. First, the Bank's claim against Glacier is not based on fraud.[3] Furthermore, the Bank knew the fair market value of the properties before it made the full credit bids. The *Alliance* court stated, "In the alternative, to the extent Alliance's full credit bids were not proximately caused by defendants' fraudulent misrepresentations, or its reliance without independent or additional inquiry was either inappropriate given the context of the relationship or was otherwise manifestly unreasonable, the full credit bid rule applies, and Alliance's bid would then constitute an irrevocable offer to purchase the property for that amount. [Citation.] Hence, under these circumstances, Alliance would not be entitled to recover the difference between its bid . . . and the actual value of the property. [Citation.]" (10 Cal.4th at p. 1247.)

The Bank offers two alternate theories in support of its contention that the trial court's ruling was erroneous: (1) in the case of an insolvent insurer, the

---

[2]*Karl* has been cited only by two out-of-state title insurance cases (*Marble Bank* v. *Commonwealth Land Title Ins. Co.* (E.D.N.C. 1996) 914 F.Supp. 1252; *Stewart Title* v. *West* (1996) 110 Md.App. 114 [676 A.2d 953]), and *Cale* has been cited only by *Karl.*

[3]The Bank expressly admitted that any fraud on the part of Glacier is not an issue in this proceeding.

Insurance Code requires the commissioner to value a claimant's security by appraisal, not bid; and (2) if the Insurance Code does not apply, the proscription against unjust enrichment requires the commissioner to use fair market value rather than unrealistically high credit bids.

Section 1029, dealing with insolvent and delinquent insurers, provides: "A claim of a secured claimant shall not be allowed in a sum greater than the excess over the value of the security of the amount for which the claim would be allowable if unsecured . . . ." And section 1030 adds, "The value of the security to be credited upon such claim shall be determined by an appraiser appointed by the liquidator and approved by the court. . . ." The Bank claims this statutory procedure is the exclusive method of valuing security in an insurance liquidation proceeding.

Section 1020 authorizes the trial court, upon the issuance of a liquidation or conservatorship order, to issue "such injunctions or other orders as may be deemed necessary to prevent 'any or all' of certain enumerated occurrences, including interference with the commissioner or the insolvency proceedings, waste of the insolvent's assets, the institution or prosecution of actions, the obtaining of preferences, and the making of a levy against the insolvent or its assets." (*Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) But the trial court, in its discretion and upon a proper showing, can exempt certain actions or assets from the stay under section 1020, and in fact *should* do so if it would be in the best interest of the insolvent insurer and the claimant. (46 Cal.3d at pp. 350-354; *In re Glacier General Ins. Co.* (1991) 234 Cal.App.3d 1549, 1554-1556 [286 Cal.Rptr. 262].)

The Bank chose to remove itself from the Insurance Code valuation procedure and pursue nonjudicial foreclosure. In its motion to modify the stay order, it advised the trial court and the commissioner the properties were worth so little that Glacier would never realize any equity from them and that the Bank's costs were increasing due to "(1) [accruing] interest . . . , (2) loss of rental income . . . , (3) lost opportunities . . . from loss of use of the value of the properties, (4) rising rehabilitation costs . . . , and (5) losses from inability to sell . . . in the currently favorable real estate market." The Bank then convinced the court it could minimize its losses by moving quickly with foreclosure sales. The court and the commissioner cooperated, and the Bank obtained an order modifying the court's injunction against foreclosure. It subsequently entered into a stipulation with the commissioner detailing the procedures to be followed before, during, and after sale. The Bank clearly made an election to resort to its security rather than wait for the appraisal method under the Insurance Code.

The Bank's claim of unjust enrichment likewise fails to hold water. After removing itself from the Insurance Code procedure and then making full

credit bids on properties worth a fraction of the corresponding loans they secured, the Bank now asserts it is unfair to require it to bear the risk of its "bidding errors." After all, it argues, if Glacier had not breached its contract by becoming insolvent, the Bank would not have been faced with the foreclosure choice.

But the Bank controlled the timing of the sales and admittedly knew the true value of the properties; nothing precluded it from bidding less than the amount it was owed. It is reasonable to hold the Bank to the full credit bid rule. (*Pacific Inland Bank* v. *Ainsworth, supra,* 41 Cal.App.4th at pp. 283-284.) As the district court observed in an analogous situation, "Why [the Bank] might choose to purchase the property for the full amount of the debt owed to it, with reason to believe that the property could be acquired at a much lower price, is of concern only to [the Bank]. . . . [¶] . . . [¶] [The Bank] offers no explanation of why an insured, acting in good faith with respect to its insurer, might think that it would have the right to acquire the mortgaged property by choking-off any offers in the range of the true value of the property with a preemptive bid and then to assert that its insurance loss was measured by anything other than the price which it bid at auction to acquire the property." (*Altus Bank* v. *State Farm Fire and Cas. Co., supra,* 758 F.Supp. at pp. 570, 571.)

The Bank asks us to augment the record to include documents from the superior court file and to take judicial notice of various documents, all designed to further the Bank's argument that meaningful appraisals of the 81 properties could now be made. The Bank also asks us to take judicial notice of material showing that claims adjudication in insurance liquidation proceedings is a lengthy process and defining the scope of remand following reversal. None of these requests involves material relevant to our decision, and we deny them. (*In re Pacific Std. Life Ins. Co.* (1992) 9 Cal.App.4th 1197, 1203 [12 Cal.Rptr.2d 50]; *Russi* v. *Bank of America* (1945) 69 Cal.App.2d 100, 102 [158 P.2d 252].)

The order of the trial court denying the requested relief is affirmed. Respondent is entitled to costs on appeal.

Sills, P. J., and Sonenshine, J., concurred.