[No. D016775. Fourth Dist., Div. One. Dec. 2, 1993.]

C. ROBERT KARL et al., Plaintiffs and Appellants, v. COMMONWEALTH LAND TITLE INSURANCE COMPANY et al., Defendants and Respondents.

COUNSEL

Scott C. Meisterlin for Plaintiffs and Appellants.

Lindley, Lazar & Scales, Michael H. Wexler and R. Gordon Huckins for Defendants and Respondents.

OPINION

FROEHLICH, J.—C. Robert and Joan Karl (plaintiffs) sued defendant Commonwealth Land Title Insurance Company (insurer), alleging that insurer had wrongfully failed to pay a claim on their title policy, to wit, a tax lien purportedly senior, and hence threatening, to plaintiff's trust deed. Insurer moved for summary judgment, arguing plaintiffs had not suffered any loss insured by the policy because they had recouped all of their money. The trial court agreed. Following entry of judgment, plaintiffs appealed.

Plaintiffs argue summary judgment was inappropriate. First, they contend that even if they had fully recouped all amounts owed on the secured note which the title policy insured, their profit from the resale of the security was reduced by the amount of the insured-against tax lien, which lost profit was a "loss" under the policy. Second, plaintiffs argue that even if an affirmative loss (i.e., failure to collect enough to cover secured amounts plus tax lien advances) is required before the title policy covers the loss, there are triable issues of fact as to whether such a loss occurred.

For the reasons discussed below, we reject plaintiffs' first argument because a title policy indemnifies against "losses," not against reduced windfall profits. However, we believe that the state of the record raises triable issues of fact as to whether plaintiffs received property the fair market value of which exceeded the amounts owed on the insured indebtedness, and therefore we must reverse.

I. *Factual Background*

This being an appeal from a summary judgment, we review the facts in the light most favorable to appellants.

A. *The Foreclosure*

In May 1988 plaintiffs acquired a $150,000 note secured by a second deed of trust on an 18-unit apartment building. In connection with that acquisition, plaintiffs also obtained a title policy (the policy) which insured against

loss or damage caused by any liens senior to their trust deed and not excepted from coverage. Insurer was the issuer of the policy.

The policy failed to list a certain tax lien which the parties agree for purposes of this appeal was senior to plaintiffs' trust deed and within the scope of coverage. In January 1989 the beneficiary of the first trust deed, Coast Federal Savings and Loan (Coast), advanced over $26,000 to pay off the tax lien in order to preserve its security interest.

In August 1989 plaintiffs learned of the tax lien and Coast's payment thereof, and also of Coast's plan to foreclose, which foreclosure would cause the loss of plaintiffs' security interest. Plaintiffs obtained Coast's agreement to reinstate the loan in return for payment of past due installments and repayment of the tax lien advance. They then contacted insurer to request that insurer pay the tax lien. Insurer refused, claiming there was not yet any loss under the policy.

Ultimately plaintiffs paid $51,131.02 to reinstate the Coast trust deed and protect their trust deed. Of that amount $26,241.69 represented the tax lien. Plaintiffs also started nonjudicial foreclosure proceedings and obtained a receiver for the property. Plaintiffs ultimately foreclosed and obtained title to the property by a credit bid of $218,599.84, which represented the amounts due on the secured note, plus expenses to acquire the property, plus the $26,241.69 paid on the tax lien.

During the period of the receivership and plaintiffs' subsequent ownership, plaintiffs were required to make repairs to the property, including plumbing, carpeting, painting, landscape refurbishing, etc. Their out-of-pocket expenses, exclusive of the value of their time and effort, totaled nearly $3,100.

A third party buyer for the property was ultimately found, and escrow on this sale closed one month after plaintiffs' foreclosure. The sale price was $220,053.21, composed of cash of $47,576.80 and a note for $172,476.41.

B.  *Plaintiffs Demand Reimbursement*

Insurer had initially told plaintiffs there would be no loss under the policy until there had been a default and sale of the property. Following the foreclosure, therefore, plaintiffs again contacted insurer to demand payment under the title policy. Insurer advised plaintiffs to put their claim in writing; they did so on December 6, 1989. The claim was denied in January 1990 for reasons unrelated to this appeal, and subsequently the claim was denied for

the additional reason that no loss had been suffered because the third party buyer had paid more than plaintiffs were owed.

## II. *The Lawsuit and Summary Judgment*

Plaintiffs sued insurer for bad faith. Insurer subsequently moved for summary judgment, arguing that because the total sales price of $220,053.21 exceeded all the amounts owed on plaintiffs' note, including the $26,241.69 tax lien payment, the resale of the property showed no loss had been suffered as a matter of law.

The summary judgment motion was opposed on several grounds. First, plaintiffs argued the policy covered "loss or damage," and payment of the tax lien was such a loss or damage regardless of the amounts recouped on subsequent sale of the security. Second, plaintiffs argued that even had the subsequent sales price been relevant to determining "loss," they had suffered a loss because they acquired the property for $218,599.84 and expended $3,090.68 in repairs, but recovered substantially less than that amount on resale.[1] The court concluded there was no triable issue of fact as to the presence of any "loss," apparently because the face amount received from the sale exceeded the $218,599.84 bid at the trustee's sale.

On appeal, plaintiffs reassert their two principal contentions: that mere payment of the lien established the "loss" under the policy regardless of the amounts they later recouped on resale; and, alternatively, that even if the amounts received on resale are relevant, there remain triable issues of fact as to whether the value of assets recovered on foreclosure equals the amount of plaintiffs' lien, as increased by expenditures.

## III. *A Title Policy Insuring the Priority of a Mortgage Only Protects the Lender to the Extent an Undisclosed Lien Impairs the Lender's Ability to Collect the Amounts Due Under the Insured Loan*

The central issue is the scope of coverage afforded by a title policy issued to insure the priority of a mortgage. Plaintiffs argue that because the

---

[1] Plaintiffs argued the $220,053.21 sales price should be discounted because the value of the $172,476.41 secured note they received was no more than $140,000, supporting their opinion of value by a letter (attached as an exhibit to their declaration) in which an expert opined the fair market value of the note was no more than $140,000. The court sustained insurer's evidentiary objection to plaintiffs' opinion as to the fair market value of the secured note on the grounds of lack of foundation and improper lay opinion. At the hearing, plaintiffs (in apparent response to the tentative ruling sustaining the evidentiary objection) offered a declaration from the economist to obviate the technical deficiencies in the proof. The court denied the request to supplement the evidence.

tax lien reduced the amount of profit they would otherwise have obtained from their resale of the property, the tax lien caused a compensable loss under the policy. Defendant contends the policy only insures that undisclosed liens will not harm the lender's ability to collect on the security, and hence since plaintiffs recovered the total amount of their note, plus all amounts advanced to protect it, there has been no compensable loss.

■ The law clearly states that a title insurance policy is a contract of indemnity, not one of guarantee. The insurer does not represent that title is in any particular condition, but only agrees to indemnify to the extent the insured suffers a loss caused by defects in the title or encumbrances on the title. (*Southland Title Corp.* v. *Superior Court* (1991) 231 Cal.App.3d 530, 537 [282 Cal.Rptr. 425]; *Smith* v. *Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 631 [223 Cal.Rptr. 339].) ■ The provisions of the instant policy reflect its undertaking: It protects against "loss or damage"; it expressly excepts from coverage "[d]efects . . . resulting in no loss or damage to the insured claimant . . ."; and it provides that coverage shall not exceed "the actual loss of the insured claimant."[2]

■ Absent a "loss" there is no obligation to pay benefits under a title policy. (*Hawkins* v. *Oakland Title Ins. & Guar. Co.* (1958) 165 Cal.App.2d 116, 122-123 [331 P.2d 742].) ■ The extent of protection afforded by a title policy to a secured lender, and an identification of the occurrence of indemnifiable "loss" under such a policy, was examined by the courts in *Lawrence* v. *Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70 [237 Cal.Rptr. 264] and *Cale* v. *Transamerica Title Insurance* (1990) 225 Cal.App.3d 422 [275 Cal.Rptr. 107].[3] The broad rule set forth in these cases is that a secured lender suffers an indemnifiable "loss" under a title policy only if the lender

---

[2]The insuring clauses of the policy, as applicable to this case, provide: ". . . Commonwealth Land Title Insurance Company . . . insures the insured . . . against loss or damage . . . sustained or incurred by said insured by reason of:
"1.   . . . ;
"2.   Any defect in or lien or encumbrance on such title;
"3.   . . . ; or
"4.   . . . ;
and in addition, as to an insured lender only:
"5.   . . . ;
"6.   Priority of any lien or encumbrance over the lien of the insured mortgage . . . ; or
"7.   . . . ."
The policy also expressly excepts from coverage "[d]efects, liens, encumbrances, adverse claims, or other matters . . . resulting in no loss or damage to the insured claimant. . . ." Additionally, under "Conditions and Stipulations," the policy provides that coverage in no case shall exceed "the actual loss of the insured claimant."

[3]We do not address the distinct issue of the extent of protection a title policy affords an owner. (See generally *Cale* v. *Transamerica Title Insurance, supra,* 225 Cal.App.3d at pp. 426-427 [the indemnifiable loss to an owner is the lost equity in the property, while the

fails to recoup the debt because of the insured-against senior lien.[4] We must closely examine each case to determine whether its approach controls here.

In *Lawrence* the secured lender obtained a title policy showing the lender's trust deed in second position. When the property owner defaulted and the lender began foreclosure proceedings, a senior undisclosed and hence insured-against lien was discovered. The lender foreclosed and obtained the property subject to the senior obligations. When it later resold the property, the sales proceeds were first distributed to pay the senior liens, including approximately $112,000 to pay off the senior insured-against lien. The remaining proceeds, coupled with contributions by the title insurer, were sufficient to fully discharge all amounts owed to the lender. (*Lawrence* v. *Chicago Title Ins. Co.*, *supra*, 192 Cal.App.3d at pp. 73-74.) Despite having recovered its entire loan, the lender contended the title insurer owed it $112,000 as damages for negligence (presumably the amount incurred to pay off the senior insured-against lien) based on omission of the lien from the policy. The *Lawrence* court concluded a title policy does not *guarantee* against an undisclosed lien, but only *indemnifies* against *loss* caused by such a lien. (*Id.* at pp. 74-75.) Because the amounts secured by the loan were fully recouped from the combined sales proceeds and insurance payments, *Lawrence* concluded no further claim on the policy existed. (*Id.* at p. 76.)

Similarly in *Cale*, when the insured secured lender began foreclosure proceedings, he discovered three senior insured-against liens and demanded that the title insurer remove them. The insurer refused on the ground that it was impossible to determine if any loss had occurred because foreclosure might produce adequate funds to discharge the senior liens and the insured lien. The insured then foreclosed, obtained the property for a credit bid of $1, and took the property subject to the insured-against liens. The insured then demanded the insurer remove the liens, but the insurer again refused on

indemnifiable loss to a lender is the extent to which the lender suffers nonpayment because of impaired security].) Plaintiffs raise two arguments to support their claim that they are entitled to the same protected equity as owners. First, because the policy uses the same form for both owners and lenders, plaintiffs claim it is ambiguous as to coverage. To the contrary, the policy is not ambiguous. It requires a loss for either owners or lenders, and the difference in coverage results from the difference in the insurable interests held by each, not from the policy language. Second, plaintiffs argue that because the policy specifies it continues after a lender forecloses they are entitled to owner's coverage—that is, lost profits. Plaintiffs ignore the fact that the "continuation clause" specifies its coverage will not exceed the amount of the unpaid debt (Conditions and Stipulations, § 2, subd. (a)(ii)), which returns us to the same question: If the debt is fully paid by the security, is there an "actual loss" under the policy?

[4] A senior lien referenced in a title policy is an encumbrance subject to which the insured takes title. If a senior lien is not referenced in the policy, the holder is indemnified against loss as a result of the undisclosed lien; hence the policy insures against the existence of the lien, resulting in our denomination of it as an "insured-against" lien.

the ground that the insured had not yet suffered a loss under the policy because he owned the property. (*Cale* v. *Transamerica Title Insurance*, *supra*, 225 Cal.App.3d at pp. 424-425.)

The *Cale* court concluded the insured had not shown any loss. It first noted that the interests held by an owner are distinct from those held by an insured lender, and hence the protection afforded to each differs. The court specifically stated that "[t]itle insurance indemnifies a lender only against loss with respect to the secured indebtedness, not a diminution of profits potentially obtainable from resale of the property." (*Cale* v. *Transamerica Title Insurance*, *supra*, 225 Cal.App.3d at p. 427.) The court concluded there would be no indemnifiable loss if the property had adequate value to cover all amounts owed on the insured debt despite the prior liens. (*Id.* at p. 428.)

*Cale* and *Lawrence* are controlling. Moreover, their approach accords with the general principles of title insurance law. ▮▮▮ A title insurer undertakes to indemnify the insured lien holder only if a defect causes a *loss* (*Southland Title Corp.* v. *Superior Court*, *supra*, 231 Cal.App.3d 530, 537); without a loss there is no obligation to pay benefits. (*Hawkins* v. *Oakland Title Ins. & Guar. Co.*, *supra*, 165 Cal.App.2d 116, 122.) In other contexts it has been noted that a secured lender's interest in the security is limited to repayment of its loan (*Brown* v. *Critchfield* (1980) 100 Cal.App.3d 858, 870 [161 Cal.Rptr. 342]; *People* ex rel. *Dept. of Transportation* v. *Redwood Baseline, Ltd.* (1978) 84 Cal.App.3d 662, 673 [149 Cal.Rptr. 11]); if the loan is fully satisfied a lender ordinarily suffers no damage. (*Sumitomo Bank* v. *Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211, 219-220 [229 Cal.Rptr. 719].) Regarding secured lenders, if the loan is fully secured as of the date of foreclosure notwithstanding the contractual default, the lender suffers no damage from such default. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 123 [135 Cal.Rptr. 802].) ▮▮▮ Here, plaintiffs were interested in the property solely as a security for their loan, and if they fully recouped all amounts due them the fact that title to the property was not as represented did not cause any cognizable loss.

Plaintiffs' arguments do not persuade us to depart from this rule. Plaintiffs argue that damages for breach of a title insurance contract are governed by Civil Code section 3300 (citing *Crain* v. *Security Title Ins. etc. Co.* (1935) 6 Cal.App.2d 343, 345 [44 P.2d 632]) and that section 3300 encompasses loss of profits within its permissible scope of damages. (See, e.g., *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 541 [145 P.2d 305].) Of course this argument

begs the question, because it presumes the issue to be decided—that is, does refusal to pay lost profits constitute a breach of the insurance contract?[5]

Plaintiffs' next set of arguments turns on the proposition that the policy is ambiguous as to whether it covers lost profits and therefore should be interpreted in favor of the insured. This effort to manufacture ambiguity is unconvincing. For example, plaintiffs point to various clauses in the policy which refer to "amounts advanced to protect the lien," and claim this demonstrates their advances to pay the tax lien are thus compensable under the policy. However, the language upon which this reliance is placed does not purport to equate "advances" with "loss," but merely clarifies that additional advances by the secured lender can operate to increase the maximum insured indebtedness.[6] ■ Ambiguities are to be construed in favor of the insured, but only when the language read in its ordinary sense is unclear. Strained interpretation may not be used to create ambiguity. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) ■ The language here is clear in providing coverage only for "actual loss."

Finally, plaintiffs cite several secondary authorities and out-of-state cases to support their position. Such authorities and cases, however, are not supportive. For example, plaintiffs cite Corpus Juris Secundum for several propositions, the most important of which being that the loss is fixed as of the date the defect is discovered and measured by the extent to which the mortgagee's security has been impaired. Plaintiffs ignore, however, the fact that the text of the treatise supports insurer's position here, because it states "A mortgagee's loss is measured by *the extent to which the insured debt is not repaid* . . . ." (46 C.J.S. (1993) Insurance, § 1235, p. 680, italics added.) Plaintiffs similarly misinterpret American Jurisprudence Second, citing it for one proposition—that the loss by a mortgagee is generally the amount of the

[5]Plaintiffs argue *Crain* holds that the measure of recovery on a title policy by the secured lender is the profit or equity lost by reason of the title defect. This is a misreading of *Crain*. In *Crain* the senior lien rendered the security entirely valueless, and the trial court awarded damages "limited [by] the loss sustained by the plaintiff [of] the value of the note and trust deed which were rendered valueless by reason of the prior encumbrance." (*Crain* v. *Security Title Ins. etc. Co., supra,* 6 Cal.App.2d at p. 345.) To the extent Crain provides any guidance, it reaffirms that it is the right of repayment, not the claim to windfall profits, which is insured.

[6]For example, section 2, subdivision (a) of Conditions and Stipulations states that if a lender acquires by foreclosure, the policy limits shall not exceed the lesser of (i) the original insurance limits, or (ii) the sum of the unpaid debt, interest, expenses of foreclosure and advances. Section 6, subdivision (a) of Conditions and Stipulations merely states that the insurer's liability will not exceed the lesser of (i) the actual loss, or (ii) the policy limits, or (iii) the unpaid debt, with interest and amounts advanced to protect the lien. The reference to advances thus does not define when a loss occurs, but merely describes the amount of the insured indebtedness.

undisclosed lien—without noting that the statement relied upon is made in the context of a discussion which measures impairment of security by the extent to which the equity is insufficient to protect the mortgage and assure repayment. (44 Am.Jur.2d (1982) Insurance, § 1567, pp. 576-577.)

The out-of-state cases similarly provide no support to plaintiffs. Plaintiffs cite *Atlanta Title & Trust Co.* v. *Allied Mortg. Co.* (1940) 64 Ga.App. 58 [12 S.E.2d 147] and *Blackhawk Prod. Credit* v. *Chicago Title* (1988) 144 Wis.2d 68 [423 N.W.2d 521] for the proposition that loss by an insured mortgagee is measured by the lost value of the equity in the real estate security which the defect caused. However, in *Atlanta Title & Trust Co.* the court noted the case had been before it on two prior occasions and on one of those appeals the court had held that the insured's complaint failed to state a cause of action because it did not allege an *actual loss from inability to collect payment of the note*. (*Atlanta Title & Trust Co.*, *supra*, 12 S.E.2d at p. 148.) Similarly, while the *Blackhawk Prod. Credit* case states that the loss is the difference between the value of the security with the defect and the value it would have had without the defect, such statement can be understood only within the broader framework of that court's analysis of whether any loss occurred. The *Blackhawk Prod. Credit* court, distinguishing between the insured interests of an owner versus a lender, stated: Defining and measuring actual loss under a title insurance policy is not the same for the owner who has title to property, and a mortgagee who holds only a security interest in the borrower's title. The fee interest of an owner is immediately diminished by the presence of lien since resale value will always reflect the cost of removing the lien. A mortgagee's loss cannot be measured *unless the underlying debt is not repaid and the security for the mortgage proves inadequate*." (423 N.W.2d at p. 525, italics added.)

Thus, generic statements about measuring the loss by the "diminishment in security" are misleading, because the inadequacy of the security becomes relevant only if the debt is unpaid, necessitating resort to the security.[7]

In conclusion, therefore, we affirm that an insured lender who receives full value in discharge of his note does not suffer a compensable "loss"

---

[7]Plaintiffs also cite *In re Gordon* (1935) 317 Pa. 161 [176 A. 494] as holding that because the fair market value of a secured note might decline (i.e., an insured-against defect may reduce the equity cushion), a secured lender has a "loss" immediately regardless of whether he is paid on the note. However, the musings of the *Gordon* court are entirely dicta, because the property in question was actually sold and the proceeds that flowed to the secured note holder were *actually* reduced by the lien. Further, to the extent *Gordon* holds that a secured note holder who received full payment from the proceeds of the foreclosure sale nevertheless had sustained compensable damage under a title policy, it flatly contradicts other Pennsylvania decisions. (See *Wheeler* v. *Equitable Trust Co.* (1908) 221 Pa. 276 [70 A. 750, 753] [creditor has no claim on policy when sale of asset fully discharged amounts owed on the secured note].) Two additional California citations do not support plaintiffs' position. In

under his title policy merely because an insured-against lien reduced the equity cushion seized on the foreclosure.

IV. *There Are Triable Issues of Fact as to Whether Plaintiffs Recouped All Amounts Due*

Although plaintiffs are not entitled to recover the reduced windfall profits, there remain triable issues of fact as to whether they recovered the amounts due on the note. There are factual questions both as to the fair market value of the property plaintiffs received and, to some degree, as to the sum to which they are entitled.[8]

We principally conclude that when an insured lender forecloses on the security, the "loss" (if any) occurs on the date of foreclosure, and the presence or absence of loss depends on whether the value received by the insured in discharge of the note (here, the property) is less than the amount owed. Here the trial court held there was no compensable "loss" under *Cale v. Transamerica Title Insurance, supra*, 225 Cal.App.3d 422, apparently because the sales price from the later sale exceeded the amounts allegedly due. We conclude this was error because the relevant value was the fair market value *as of the date of foreclosure*, not the price realized at a *later* sale.

Since the insured lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of loss.[9] Further, even though the lender's note is in default, an anticipated loss cannot be measured until completion of foreclosure because only then is

*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra*, 66 Cal.App.3d at page 119, the diminished value of the security as a result of breach of contract was relevant because sale of the property did not generate sufficient funds to fully pay the lender. In *People ex rel. Dept. of Transportation* v. *Redwood Baseline, Ltd., supra*, 84 Cal.App.3d at pages 684-685, the court specifically recognized that a lender's interest in an "equity cushion" was relevant only because the note remained unpaid.

[8]The record is ambiguous as to what amount was due. Plaintiffs' credit bid of $218,599.84 was composed of principal and interest, plus expenses to acquire the property, plus the $26,241.69 paid on the tax lien. However, the evidence suggests plaintiffs spent time and money renovating the premises, which amounts (if spent prior to foreclosure) might become part of the insured amounts under the policy if deemed advanced to protect the lien and if secured by the mortgage at the time of the foreclosure. (See Conditions and Stipulations, § 2, subd. (a)(ii).) Because we draw all inferences in the light most favorable to the party opposing summary judgment, there is at least a possibility that some of plaintiffs' renovations fell under these provisions, which would operate to increase the amounts due beyond the credit bid of $218,599.84.

[9]*Overholtzer* v. *Northern Counties Ins. Co.* (1953) 116 Cal.App.2d 113 [253 P.2d 116], which appears to state the contrary rule that damages are measured on the date of "discovery"

there certainty the lender will not be paid in full.[10] Consequently, it is clear that in the typical case[11] the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure.

At that time, however, the lender's note is extinguished and replaced by assets recovered on foreclosure: either cash as paid by a third party bidder or the realty as bought in by the foreclosing lender. It is now possible to measure the value of the recovery by the lender, and we believe the loss which is insured by the title policy should be recognized and measured as of that time. The majority opinion in *Cale* v. *Transamerica Title Insurance*, *supra*, 225 Cal.App.3d at pages 426-427 appears to state a contrary rule, however. The insured lender in that case had bought in at foreclosure for $1, and at the time of claim of loss continued to own the property. Since the lender had not sold the property the majority held that he had not established his loss. "If one of the senior lienors were to foreclose, or if [Lender] were to sell the property on the open market, he might then suffer an indemnifiable loss under the policy, but only to the extent the proceeds of sale otherwise available to discharge [Lender's] lien are required instead to discharge any of the undisclosed senior liens." (*Id.* at p. 428.)

---

of the defect (*id.* at p. 130), is not on point because it involved a policy insuring an owner's interest as distinguished from a lender's.

[10]For example, the debtor can reinstate the loan under Civil Code section 2924c if he is within the reinstatement period. Even if the debtor does not reinstate the loan, he can save the property by paying the loan in full prior to the foreclosure sale. (4 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) Deeds of Trust and Mortgages, §§ 9:142-9:144, pp. 464-470.) Finally, the competitive bidding at the foreclosure sale theoretically might generate a third party bid in an amount sufficient, after paying costs and fees of foreclosure, to discharge the secured loan. (*Id.* at § 9:155, pp. 519-523.) Nonpayment is thus certain only on close of the foreclosure sale.

[11]We deal here, as apparently will usually be the case, with a foreclosing lender. If a prior undisclosed lien is discovered when there is no default in payment of the lender's insured lien, no damage has occurred. If default occurs and foreclosure is instituted, the note will be extinguished and value substituted either in terms of acquisition of the realty or by the sale on foreclosure to a third party, with either event constituting a realization of the note which can be used to measure possible loss. We recognize, however, that there may be other events which could trigger recognition of loss. The insured lender, for instance, might either be unable or elect not to cure the defect caused by the prior undisclosed lien, allowing the prior lien holder to foreclose, thus destroying the insured lender's security and the value of his note. We do not suggest that such chain of events would not trigger liability under the insurance policy. Accordingly, our opinion in this case should not be construed as imposing upon the insured lender, who discovers a prior undisclosed lien, the unconditional obligation of curing the lien and then foreclosing, in order to cause maturation of the title company's liability. Further, there are no doubt other possible occurrences which could demonstrate actual loss by the insured lender, including conceivably the loss incurred when the note is sold at a large discount caused by the existence of the originally undisclosed prior lien.

We favor the reasoning of Justice Simms's "dissenting" opinion in *Cale*.[12] The dissent instructs that a lender who claims injury from an undisclosed lien, and who has foreclosed and obtained title to the property, must "prove at trial the following *as of the date of foreclosure*:

"(1) That the value of the subject property was less than the total of [Lender's] lien plus all prior liens. This is so because *if the value of the subject property, obtained at foreclosure, was sufficient to satisfy all liens, including [Lender's]*, he would suffer no damage.

"(2) That the value of the subject property (exclusive of all liens) was more than the amount of the disclosed [senior] lien[s]. If the value of the property (exclusive of all liens) did not exceed the amount of the disclosed [senior liens], then [Lender] would not have recovered on his lien even if [insurer's] undisclosed liens had not existed. Thus, [Lender] cannot make [insurer] pay for his bad investment judgment in securing his loan with a hovel whose value would not satisfy even the first lien." (*Cale* v. *Transamerica Title Insurance, supra*, 225 Cal.App.3d at p. 429, italics added.)

We believe this approach to be sound. It recognizes that in situation (1) the lender has obtained "payment" (albeit in property rather than cash) because the asset has equity sufficient to pay off all liens through the lender's lien. Further, by focusing on the fair market value of the property rather than on the amount of the lender's credit bid, a lender cannot manipulate the bidding process at the foreclosure sale artificially to increase his loss, but is charged with what is actually received for the note.[13]

The "fair market value as of foreclosure" approach also eliminates other concerns raised by the plaintiffs which otherwise are inherent in a delayed determination of loss. For example, following foreclosure lenders may invest cash or their own time and effort in renovation of the property. An increase in market value as a result of such contribution should not redound to the bene fit of the insurer. Similarly, a lender's expertise in marketing which results in a sale at higher than market value should not profit the insurer (see *Blackhawk Prod. Credit* v. *Chicago Title, supra*, 423 N.W.2d at p. 526).

---

[12]We use quotations to refer to Simms's opinion as a "dissent," because the bulk of his analytical framework appears harmonious with the majority approach, and the two approaches only diverged on the question of whether the lender had raised a triable issue of fact as to whether the security was in fact inadequate to cover the loan. (*Cale* v. *Transamerica Title Insurance, supra*, 225 Cal.App.3d at pp. 430-431.)

[13]A major concern of the *Cale* majority was Cale's claim that because he credit bid $1 at the foreclosure sale, the property had only $1 of equity, and hence all amounts beyond that had been diverted by the senior undisclosed liens. *Cale* rightfully rejected this effort to manipulate the credit bid of the foreclosing party into a conclusive valuation of the property.

Finally, it seems unfair to measure damage by a market sale which may occur at a time distant from the date of foreclosure, during which period inflation or deflation may have altered the value of the property. A rule requiring measurement of loss as of the date of foreclosure eliminates these troublesome issues. It also permits the maturation of the claim against the title insurer. To paraphrase Justice Simms's language, "[when the lender] has made a prima facie showing . . . that he was damaged and suffered loss when he foreclosed on the property . . . [the title company] cannot avoid its obligations under the policy by offering to continue to insure him." (*Cale*, *supra*, 225 Cal.App.3d at p. 431.)

## V. *The Remaining Contentions Are Moot*

In that the trial court measured "loss" based on the later resale of the property rather than on the value of the property as of the date of foreclosure, remand is necessary. We briefly address the remaining contentions to explain their relevancy on remand.

Plaintiffs argued that the entire resale transaction was irrelevant to whether any loss occurred. To the extent plaintiffs' objection asserts that resale price does not *control* valuation, plaintiffs are correct. However, to the extent the resale transaction constitutes material on which experts might rely to determine fair market value as of foreclosure, the resale transaction is relevant.

Plaintiffs claim the price obtained on resale included a promissory note the value of which was less than its nominal face value, further claiming the trial court erred in failing to account for this discrepancy. Since the value of the property is to be determined as of foreclosure, whether the price plaintiffs received on later sale was good or bad, and whether they structured the sale favorably or unfavorably, should not control the valuation. Of course, if the resale of the property, being at arm's length and at a date closely following foreclosure, be deemed evidence of the value of the property at foreclosure, the total sales price may appropriately be discounted for utilization in any appraisal if the note taken as part of the sales price has a fair market value less than its face value.

Plaintiffs also claim that their time and effort in repairing the property, together with their expenditures, should be taken into account in determining value of the asset. Of course the value of the property as of the date of foreclosure would be increased by preforeclosure improvements, and to the extent plaintiffs' efforts and expenditures would qualify for addition to the insured amounts (see fn. 8, *ante*), such amounts would potentially be recoverable. Postforeclosure renovations, however, would not increase the property's value as of the "valuation date" and hence would appear irrelevant.

## DISPOSITION

The judgment is reversed and the case remanded to the superior court for further proceedings consistent with this opinion. All parties shall bear their own costs on appeal.

Wiener, Acting P. J., and Todd, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 17, 1994. Mosk, J., was of the opinion that the petition should be granted.