Opinion
 

 NARES, J.
 

 Introduction
 

 Plaintiffs C. Robert Karl (Mr. Karl) and Joan Karl (Mrs. Karl) (collectively, the Karls) sued defendant Commonwealth Land Title Insurance Company (Commonwealth) for tortious breach of insurance contract, alleging Commonwealth wrongfully failed to pay an insurance claim they made under their standard secured lender’s title policy. The Karls asserted they had paid an undisclosed senior tax lien in the amount of $26,241.69 in order to protect their junior security interest in the subject real property, and were thus entitled to indemnification in this amount under their policy.
 

 Commonwealth denied the Karls’ insurance claim, asserting they would suffer no compensable loss under the policy if the proceeds from the resale of the property were sufficient to pay the outstanding balance owed on the secured note and reimburse them for the tax lien payment. This insurance bad faith action followed.
 

 The trial court entered summary judgment in favor of Commonwealth on the ground there was no triable issue of material fact as to the existence of any “loss” under the policy because the undisputed facts showed the value the Karls received when they resold the real property security exceeded the amount of their credit bid when they foreclosed their second trust deed and acquired title to the property.
 

 
 *861
 
 The Karls appealed and we reversed the summary judgment. In our published opinion in
 
 Karl
 
 v.
 
 Commonwealth Land Title Ins. Co.
 
 (1993) 20 Cal.App.4th 972 [24 Cal.Rptr.2d 912]
 
 (Karl I),
 
 we adopted a “fair market value as of foreclosure” rule and held that when an insured secured lender claims injury from an undisclosed senior lien, and has foreclosed upon and acquired title to the security by means of a credit bid, the lender’s “loss” (if any) occurs on the date of the foreclosure.
 
 (Id.
 
 at p. 983.) We further held that in determining whether the foreclosing lender has sustained a “loss” under the policy, the value of the acquired security is its fair market value as of the date of foreclosure, not the price realized at a later sale.
 
 (Ibid.)
 
 We also concluded there were triable issues of material fact both as to the fair market value of the apartment complex the Karls acquired with their credit bid, and as to the sum owed to them.
 
 (Ibid.)
 

 On remand, a jury found the fair market value of the property at the time of foreclosure was $714,993, which exceeded the stipulated total debt against the property of $695,062.69. The court found the Karls had not sustained a covered loss under the policy. The court also granted the Karls’ motion to tax Commonwealth’s entire claim for expert witness costs in the amount of $35,451.36. Both the Karls and Commonwealth appeal from the judgment entered in favor of Commonwealth. We affirm.
 

 Contentions
 

 The Karls appeal, contending first that the court erred in the manner in which it determined whether the Karls suffered a covered loss under the title policy on the foreclosure sale date because (a) the court did not allow the value of the Karls’ preforeclosure property renovation services to be added to the secured indebtedness under the note, and (b) the court did not apply a “liquidation to cash equivalent” test in determining the fair market value of the apartment complex which secured the indebtedness.
 

 The Karls also contend that the court erroneously excluded the testimony of the postforeclosure buyer of the property (Patrick McMillin) regarding both the fair market value of the real property, and the fair market cash value of the note the Karls took back on the resale of the property; that the court erroneously ruled Commonwealth did not waive the right to deny coverage on the basis the Karls had sustained no loss under the policy; that the court erroneously denied the Karls’ motion for an order summarily adjudicating Commonwealth had a duty to “not deny [the Karls’ insurance] claim in the manner in which it did”; and last, that public policy considerations warrant a reconsideration of our decision in
 
 Karl I.
 

 
 *862
 
 Commonwealth separately appeals, contending the court erred in granting the Karls’ motion to tax Commonwealth’s claim for recovery of its expert witness costs under Code of Civil Procedure section 998.
 
 [1]
 

 Factual and Procedural Background
 

 A.
 
 The Title Policy
 

 The Karls are a retired married couple who invested $128,000 in the purchase of a promissory note with a face value of $150,000 and secured by a second deed of trust (the insured lien) on an 18-unit apartment building. In connection with the acquisition of the note, a California Land Title Association (CLTA) standard coverage lender’s title insurance policy (the policy) was assigned to the Karls.
 

 The policy, which had been issued by Commonwealth through Union Land Title Company (Union) to the original payee of the secured note, indemnifies the insured “against loss or damage, not exceeding the amount of insurance stated in Schedule A [$150,000], and costs, attorneys’ fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by said insured by reason of: [1 . . .6. Priority of any lien or encumbrance over the lien of the insured mortgage, said mortgage being shown in Schedule B in the order of its priority . . . .” The policy contains the following exclusion from coverage: “9. Defects, liens, encumbrances, adverse claims, or other matters ...(c) resulting in no loss or damage to the insured claimant. . . .”
 

 The policy also provides that in the event the insured lender acquires by foreclosure or trustee’s sale the real property securing the note, “. . . the amount of insurance hereunder, exclusive of costs, attorneys’ fees and expenses which the Company [Commonwealth] may be obligated to pay, shall not exceed the least of: [*][]... (ii) the amount of the unpaid principal of the indebtedness plus interest thereon, . . . expenses of foreclosure and
 
 amounts advanced to protect the lien of the insured mortgage and secured by said mortgage at the time of acquisition
 
 . . . .” (Italics added.)
 
 [2]
 

 B.
 
 The Undisclosed Senior Tax Lien
 

 The policy failed to list a real property tax lien that was senior to the Karls’ insured lien and not excepted from coverage. The beneficiary of the first trust deed, Coast Federal Savings and Loan Association (Coast), advanced over $26,000 to pay off the tax lien in order to preserve its security interest, and added this amount to the secured indebtedness.
 

 
 *863
 
 C.
 
 The Karls’ Preforeclosure Efforts to Renovate the Security Property and Their Acquisition of the Property at the Nonjudicial Foreclosure Sale on November 28,1989
 

 In 1989 both the Karls’ second trust deed loan and Coast’s first trust deed loan were in default. The Karls learned of the tax lien and Coast’s payment thereof. They also learned of Coast’s plan to foreclose, which would cause the loss of their security interest.
 

 After Coast initiated foreclosure proceedings, the Karls obtained Coast’s agreement to reinstate the first trust deed and note in return for the Karls’ payment of past due installments and reimbursement for the tax lien advance.
 

 In early August 1989, the Karls initiated nonjudicial foreclosure proceedings and took possession of the apartment complex through the appointment of a receiver. The Karls contacted Union to determine Commonwealth’s position regarding their potential claim regarding the tax lien. Union advised the Karls they did not have a claim because they had not yet suffered any loss under the policy as a result of the tax lien.
 

 To protect their ability to foreclose their second trust deed, the Karls paid Coast $51,131.02 in September 1989 to reinstate Coast’s first trust deed and note. Of that amount, $26,241.69 represented the Karls’ reimbursement to Coast for its payment of the tax lien.
 

 At the nonjudicial foreclosure sale on November 28, 1989, the Karls acquired title to the property with a credit bid of $218,599.84. The amount of the bid represented the sum due on the secured note, plus the trustee’s fees and the $26,241.69 paid on the tax lien.
 

 During the period of the receivership and their subsequent ownership of the apartment complex, the Karls expended time, effort and money making various repairs to the property, including repairs to the plumbing system, replacement of carpeting and refrigerators, the cleaning of rooms, and the refurbishing of the landscaping. The Karls’ net out-of-pocket expenses, exclusive of the value of their time and effort, totaled nearly $3,100.
 

 D.
 
 The Resale of the Property in December 1989
 

 The Karls found a third party buyer for the property, McMillin Investment Properties, Inc. (McMillin), and escrow closed on the resale of the property on December 28, 1989, one month after the Karls acquired the property
 
 *864
 
 through their credit bid at the foreclosure sale. The total sales price exceeded $695,000. Of this amount, the Karls received consideration in the amount of $220,053.21, composed of $47,576.80 in cash and a purchase money second trust deed and note with a face value of $172,476.41.
 

 E.
 
 The Karls’ Demand for Indemnification Under the Policy
 

 On December 6, 1989, following the foreclosure sale, Mr. Karl sent a written insurance claim to Union informing it again of the then paid tax lien and requesting indemnification under the title policy. Union forwarded the claim to Commonwealth, which received the claim on or about January 17, 1990.
 

 In a letter to the Karls dated January 23, 1990, Commonwealth denied their claim for three reasons: (1) Commonwealth was prejudiced by the Karls’ failure to tender the claim back in August 1989; (2) their payment of the tax lien without its consent was “an unnecessary voluntary assumption of liability”; and (3) the tax lien was not a lien when the policy was issued because the tax collector had marked the taxes “paid” after the prior owner paid the taxes with a bad check, and the tax lien was reinstated after the policy date. Commonwealth concluded the letter by stating, “. . . if you have any other information or authority which you believe would establish the claim as a covered matter under the policy, please contact the undersigned as soon as possible so that this office may re-evaluate its position on coverage.”
 

 On January 31, 1990, Mr. Karl responded in writing to Commonwealth’s January 23 letter, asserting that Union had knowledge of the claim in August 1989 and the tax lien did exist when the policy was issued. He also stated he was willing to accept a prompt payment on his claim in the amount of $26,241.69 (the amount of the tax lien).
 

 On February 8, 1990, Commonwealth sent a letter to Mr. Karl informing him it had reevaluated the claim, but reaffirming the denial of coverage on the grounds stated in the January 23 letter, and denying his claim for the additional reason the Karls had not submitted proof of loss. Citing
 
 Lawrence
 
 v.
 
 Chicago Title Ins. Co.
 
 (1987) 192 Cal.App.3d 70 [237 Cal.Rptr. 264], the letter further stated, “[i]f you received, or will receive from the sale, enough money to pay the outstanding balance of your loan plus what you paid Coast Savings to reimburse Coast Savings for the taxes, you have suffered no compensable loss under the policy anyway.”
 

 
 *865
 
 F.
 
 The Karls’ Insurance Bad Faith Lawsuit and Summary Judgment in Favor of Commonwealth
 

 The Karls sued Commonwealth in tort for insurance bad faith. Commonwealth subsequently moved for summary judgment, arguing the Karls suffered no loss as a result of the tax lien because the undisputed material facts showed that the total consideration of $220,053.21 received by the Karls upon their resale of the property to McMillin exceeded all the amounts owed to them on their note, including the $26,241.69 tax lien payment.
 

 The Karls opposed the summary judgment motion, arguing the policy covered “loss or damage,” and payment of the tax lien was such a loss or damage regardless of the amounts recouped on resale of the property. The Karls also argued that even if the resale price were relevant to determining “loss,” they had suffered a loss of over $34,000 because (1) they acquired the property with a credit bid of $218,599.84 but expended $3,090.68 in repairs, bringing their investment in the property to $221,690.52 (not including the value of the time and effort they spent refurbishing the property); and (2) they recovered substantially less than that amount on resale because although they received cash in the amount of $47,576.80, they took back a $172,476.41 promissory note, the fair market value of which was only $140,000, and thus they only received the cash equivalent of $187,576.80 in consideration on the resale.
 
 [3]
 

 The court granted the motion and entered summary judgment in favor of Commonwealth, concluding there was no triable issue of fact as to the existence of any “loss” under the policy, apparently because the face amount of the consideration the Karls received from the resale exceeded their $218,599.84 credit bid at the trustee’s sale.
 

 G.
 
 The Prior Appeal (Karl I) and Remand
 

 As we noted in
 
 Karl I,
 
 the Karls appealed from the summary judgment, reasserting their two principal contentions that mere payment of the tax lien established a “loss” under the policy regardless of the amounts they later recouped on resale of the property; and, alternatively, even if the consideration they received on resale were relevant, there were triable issues of fact as to whether the value of assets recovered on foreclosure equaled the amount of their insured lien, as increased by their repair expenditures.
 
 (Karl I, supra,
 
 20 Cal.App.4th at p. 977.)
 

 As already discussed, we reversed the summary judgment and adopted a “fair market value as of foreclosure” rule, holding that when an insured
 
 *866
 
 secured lender claims injury from an undisclosed senior lien, and has foreclosed upon and obtained title to the security by means of a credit bid, the lender’s “loss” (if any) under a standard lender’s title policy occurs on the date of the foreclosure.
 
 (Karl I, supra, 20
 
 Cal.App.4th at p. 983.) We also held that in determining whether the lender has sustained a “loss” under the policy, the value of the acquired security is its fair market value as of the date of foreclosure, not the price realized at a later sale.
 
 (Ibid.)
 
 We further held there were triable issues of material fact as to both the fair market value of the apartment complex the Karls acquired with their credit bid at the trustee’s sale, and the sum owed to them.
 
 (Ibid.)
 
 We remanded the case to the court below for further proceedings consistent with our opinion.
 
 (Id.
 
 at p. 987.)
 

 H.
 
 Denial of the Karls’ Motion for Summary Adjudication
 

 The Karls moved for an order summarily adjudicating that Commonwealth “did owe a duty to [the Karls] under [the] cause of action contained in Count One of [their] complaint to not deny [their] insurance claim in the manner in which said claim was so denied.” The court denied the motion on the ground “it [did] not completely dispose of [an] entire cause of action as required by CCP section 437c(f)(l).”
 

 I.
 
 Jury Trial and Entry of Judgment in Favor of Commonwealth
 

 On remand during pretrial proceedings on January 24, 1995, the court granted Commonwealth’s
 
 in limine
 
 request for a bifurcated jury trial to first determine the fair market value of the property at the time of foreclosure. The court also granted Commonwealth’s
 
 in limine
 
 motion for an order barring the Karls’ attorney from making reference during his opening statement to the Karls’ claim that the value of their own preforeclosure property refurbishment services while they were mortgagees in possession should be added to the stipulated total indebtedness of $695,062.69. The court also granted Commonwealth’s
 
 in limine
 
 motion for an order barring the Karls’ attorney from making reference during his opening statement to the cash equivalent (“liquidated”) value of the property at the time of the foreclosure.
 
 [4]
 

 The Karls testified at trial, which began on January 25, 1995. With regard to the preforeclosure condition of the apartment complex, Mr. Karl testified
 
 *867
 
 the property had been neglected, three apartments were mildewed and uninhabitable as a result of water leakage, and there were numerous holes in walls and ceilings from previous repairs to the plumbing system. The Karls spent a little over $3,000 making various repairs. Mr. Karl testified no one offered $695,000 at the trustee’s sale to buy the property, and in his opinion the fair market value in cash at that time was $635,000. He also testified the fair market value of the $172,476.41 note he took back from Patrick McMillin one month later upon resale of the property was $110,000.
 

 On cross-examination, Mr. Karl testified that trial exhibit No. 105 was his attempt to document the hours he and his wife spent on the property. However, Mr. Karl did not testify to the actual hours spent or the value of the services he and his wife rendered in refurbishing the property, and exhibit No. 105 was not introduced into evidence.
 

 Michael Willoughby, the Karls’ designated economist, testified the $172,476.41 purchase money note the Karls took back from McMillin had a cash value of between $120,000 and $140,000 in September 1991.
 

 Mrs. Karl testified in her opinion the fair market value of the property at the time of the trustee’s sale in November 1989 was more than $465,000 and was probably around $610,000.
 

 Patrick McMillin (Patrick) testified he was an officer of McMillin, which owned the property from December 29, 1989, to April 1993 when McMillin gave the property back to the Karls. Patrick was not designated as an expert witness. Noting the Karls had designated an expert appraiser, the court ruled Patrick could not testify as an expert as to the fair market value of the property at the time of the foreclosure sale in November 1989, nor could he give lay opinion regarding such value because he had only been an intervening owner of the property and there was “extreme potential for confusing the jury between the fair market value of the property and the value to any individual buyer . . . .”
 

 The Karls’ designated real estate appraiser, Lee Johnson, testified he did not perform an on-site inspection of the property, but did drive to the property and inspected it from off site. Using a comparable sales approach, Johnson testified the fair market value of the property was $594,000 at the time of the trustee’s sale on November 28, 1989. Johnson further testified that the fair market value of the property under a gross rent multiplier approach was $85,080 times 7.5 ($638,100). Using a traditional income
 
 *868
 
 approach, Johnson further opined the fair market value of the property was $606,000.
 
 [5]
 

 Commonwealth’s designated real estate appraiser, Harold Godwin, testified he performed an on-site inspection of the property and determined the fair market value of the property was $747,000 on November 28, 1989.
 

 Following the conclusion of the evidence phase of the trial, the court considered the parties’ briefs on the issue of whether Commonwealth had waived the right to deny coverage on the basis that the Karls had suffered no compensable loss under the policy. After hearing argument on this issue, the court deferred its ruling pending the jury’s verdict on the fair market value of the property.
 

 By a vote of 11 to 1, the jury returned a special verdict in which they found the fair market value of the property was $714,993 at the time of the foreclosure sale on November 28, 1989.
 

 The parties stipulated the amount of the Karls’ lien and all senior liens was $695,062.69.
 
 [6]
 
 The parties also stipulated the reasonable cost to liquidate the property to cash would have been 5 percent of the fair market value as of the foreclosure date.
 

 Noting our opinion in
 
 Karl I
 
 did not expressly provide for the reduction of the fair market value of the property on the date of foreclosure by the potential costs of sale for a liquidation of the property to cash, the court made a postverdict ruling rejecting the Karls’ contention that the jury’s fair market value finding of $714,993 should be reduced by the stipulated 5 percent of the fair market value to account for potential sales costs. The
 
 *869
 
 court then found the Karls had not suffered a compensable loss on the foreclosure sale date because the fair market value of $714,993 on that date exceeded the total secured indebtedness against the property in the stipulated amount of $695,062.69.
 

 The court then ruled on the deferred waiver issue and found Commonwealth had not waived the right to deny coverage on the basis that the Karls had suffered no compensable loss under the policy. The court found the Karls could not prove an essential element of their case (i.e., a compensable loss under the policy) and entered judgment in favor of Commonwealth.
 

 J.
 
 Order Granting the Karls’ Motion to Strike or Tax Commonwealth’s Claim for Expert Witness Costs Under Section 998
 

 Following entry of judgment, Commonwealth served and filed an amended cost bill seeking (among other things) expert witness costs in the amount of $35,451.36 under section 998.
 
 [7]
 
 Commonwealth had made its section 998 offer to compromise in anticipation of the commencement of expert witness depositions. The offer was to allow a judgment to be taken against Commonwealth in the amount of $26,241.60 with interest at 10 percent per annum from November 28,1989, the date of the foreclosure sale. The Karls did not accept the offer.
 

 The Karls moved to tax Commonwealth’s claim for expert witness costs. Citing
 
 Meissner
 
 v.
 
 Paulson
 
 (1989) 212 Cal.App.3d 785 [260 Cal.Rptr. 826], the court granted the motion on the ground the section 998 offer was invalid because it had been made jointly to the Karls without an apportionment between them.
 

 Discussion
 

 Both the Karls and Commonwealth appeal from the judgment. We first address the Karls’ appeal.
 

 
 *870
 
 The Karls’ Appeal
 

 I
 

 There Is No Basis for Review of the Karls’ Contention the Court Improperly Failed to Consider the Value of Their Preforeclosure Property Renovation Services in Determining Whether They Suffered a Loss
 

 *
 

 II
 

 The Court Properly Rejected the Karls’ Contention the Fair Market Value of the Property on the Foreclosure Sale Date Should Be Reduced by the Reasonable Cost of Resale
 

 The Karls next contend the court erred in the manner in which it determined whether they suffered a compensable loss under the policy on the foreclosure sale date in that the court failed to apply a “liquidation to cash equivalent” test in determining the fair market value of the apartment complex which secured the indebtedness. Citing
 
 Lawrence
 
 v.
 
 Chicago Title Ins. Co., supra,
 
 192 Cal.App.3d at page 74, footnote 3, the Karls assert that “[i]n determining whether an insured lender has sustained a loss, it must be determined whether said lender received what he bargained for.” The Karls contend they, like all lenders, bargained for repayment in cash, and the court improperly refused to reduce the fair market value of the property to a “cash equivalent” value by subtracting the reasonable costs of selling the property. We disagree.
 

 We begin our analysis by noting the parties stipulated at trial that the reasonable cost to liquidate the property to cash would have been 5 percent of its fair market value as of the foreclosure sale date. The Karls correctly assert the evidence at trial would have established that they sustained a loss under the policy, and thus that they would have been entitled to judgment in their favor, if the court was required by our
 
 Karl I
 
 decision to reduce the jury’s fair market value finding by the stipulated 5 percent and thereby discount the fair market value to a liquidated “cash equivalent” value. The Karls contend such calculation would have resulted in a liquidated “cash equivalent” value of $679,243, a sum less than the stipulated total secured
 
 *871
 
 indebtedness of $695,062.69 as of the foreclosure sale date, thereby establishing they had sustained a loss under the policy.
 
 [9]
 

 We reaffirm our holding in
 
 Karl I
 
 that when an insured lender claims injury from an undisclosed senior lien and has foreclosed upon and acquired tide to the security by means of a credit bid, the lender’s “loss” (if any) occurs on the date of the foreclosure sale, and for purposes of determining whether the lender has sustained a loss under a standard lender’s title policy the relevant value of the security is the fair market value as of the date of foreclosure.
 
 (Karl I, supra,
 
 20 Cal.App.4th at p. 983.) We hold that for purposes of determining whether an acquiring secured lender in possession of the security has sustained a loss under a standard lender’s title policy following discovery of a senior lien not excepted from coverage, the relevant value of the acquired security is the fair market value as of the date of foreclosure, not the fair market value on that date less the reasonable potential cost of selling the security.
 

 We reject the Karls’ contention that investors who purchase notes secured by junior deeds of trust bargain exclusively for repayment of the loan in cash. We agree with Commonwealth that a secured lender typically bargains for repayment of the loan in cash and, in the event of a default in breach of the loan agreement, satisfaction through the remedy afforded by the foreclosure process. If foreclosure on the security leads to acquisition of the property by a third party bidder, there is no guarantee the lender will receive consideration equivalent in value to what the lender would have received had the outstanding principal balance and accrued interest owing on the note been paid in full in cash.
 

 The Karls rely on various sections of division 2 of the California Uniform Commercial Code
 
 [10]
 
 for the proposition that “[t]he law provides that when one is due money, but instead is required to take property, one is allowed to
 
 *872
 
 ascertain their [sz'c] damages by deducting from the fair market value ‘any commercially reasonable charges, expenses or commissions’ that would be incurred in selling said property.” The Karls’ reliance on these statutes is misplaced. Section 2102 of the California Uniform Commercial Code governs the scope of application of division 2 of this Code and expressly states in part, “. . . this division applies to transactions in goods.” The Uniform Commercial Code thus has no application to the secured real property transactions at issue in the case before us.
 

 Ill
 

 The Court Did Not Abuse Its Discretion in Excluding the Testimony of Patrick McMillin
 

 *
 

 IV
 

 The Court Properly Ruled as a Matter of Law That Commonwealth Did Not Waive the Right to Deny Coverage On the Basis the Karls Sustained No Loss Under the Policy
 

 The Karls next contend the court erroneously ruled as a matter of law that Commonwealth did not waive the right to deny coverage on the basis that the Karls had sustained no loss under the policy. The Karls further contend that “the evidence in this case demonstrates that [Commonwealth] knowingly and intentionally waived that basis for denying coverage,” they therefore did not have to prove they suffered a loss under the policy in order to prevail on their insurance bad faith cause of action, and thus the court erroneously entered judgment in favor of Commonwealth on the ground the Karls could not establish an essential element of their claim (i.e., a loss under the policy). We reject these contentions.
 

 The issue of whether the court properly ruled as a matter of law that Commonwealth did not waive the right to deny coverage on the ground the Karls sustained no loss, is a question of law. Accordingly, we review de
 
 *873
 
 novo.
 
 (Ghirardo
 
 v.
 
 Antonioli
 
 (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)
 

 We preliminarily note the Karls’ contention on the issue of waiver appears to be based on their assertion “[i]t is undisputed that [Commonwealth’s] January 23, 1990 letter was intended to act as a denial of the [Karls’ insurance] claim . . . , and that the letter did not raise any issue pertaining to the amount of [the Karls’] loss” under the policy.
 

 The legal principles guiding our analysis are succinctly summarized in
 
 Waller
 
 v.
 
 Truck Ins. Exchange, Inc.
 
 (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]:
 

 “Case law is clear that ‘ “[w]jaiver is the intentional relinquishment of a known right after knowledge of the facts.” [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and “doubtful cases will be decided against a waiver” [citation].’ [Citations.] The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. [Citation.]
 

 . . California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. [Citations.]”
 

 Declining to follow the automatic waiver rule announced in
 
 McLaughlin
 
 v.
 
 Connecticut General Life Ins. Co.
 
 (N.D.Cal. 1983) 565 F.Supp. 434,
 
 [12]
 
 the Supreme Court in
 
 Waller
 
 held an insurer does not impliedly waive coverage defenses it fails to mention when it denies a claim.
 
 (Waller
 
 v.
 
 Truck Ins. Exchange, Inc., supra,
 
 11 Cal.4th at p. 31.) The Supreme Court reasoned that the
 
 McLaughlin
 
 automatic waiver rule was “. . . inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed.”
 
 (Id.
 
 at p. 33.)
 

 Here, the relevant facts are not in dispute. On December 6,1989, Mr. Karl sent his written insurance claim to Union informing it of the Karls’ payment of the tax lien and requesting indemnification under the title policy. Union
 
 *874
 
 forwarded the claim to Commonwealth, which received the claim on or about January 17, 1990.
 

 In a letter to the Karls dated January 23, 1990, Commonwealth denied their claim on several grounds, but did not deny the claim on the ground the Karls had sustained no loss. Commonwealth concluded the letter by stating . . if you have any other information or authority which you believe would establish the claim as a covered matter under the policy, please contact the undersigned as soon as possible so that this office may reevaluate its position on coverage.” Although this letter is unquestionably a denial of coverage with respect to the Karls’ claim, it expressed willingness on the part of Commonwealth to reevaluate the denial of coverage in the event the Karls provided additional information establishing coverage under the terms of the insurance contract.
 

 On February 8, 1990, Commonwealth sent a second letter to Mr. Karl informing him it had reevaluated his claim, but reaffirming the denial of coverage on the grounds stated in the January 23 letter, and denying coverage for the additional reason the Karls had not submitted proof of loss.
 
 [13]
 
 Citing
 
 Lawrence
 
 v.
 
 Chicago Title Ins. Co., supra,
 
 192 Cal.App.3d 70 as authority the letter states, “[i]f you received, or will receive from the sale, enough money to pay the outstanding balance of your loan plus what you paid Coast Savings to reimburse Coast Savings for the taxes, you have suffered no compensable loss under the policy anyway.” The letter concludes, “. . . if you still feel that you have additional information or authority which would establish this claim as a covered matter under the policy, you are still welcome to submit it to this office for review so that we may re-evaluate our position on coverage.” The February 8 letter, like the January 23 letter only two weeks before, expressed Commonwealth’s willingness to reevaluate its denial of coverage in the event the Karls provided additional information establishing coverage under the terms of the policy.
 

 On these undisputed facts, we conclude as a matter of law that Commonwealth did not expressly or impliedly waive the right to assert lack of proof of loss as a ground for denial of coverage with respect to the Karls’ insurance claim. Although Commonwealth did not mention lack of proof of loss as a coverage defense in its original January 23 denial letter, it did so a mere two weeks later in its February 8 letter, and both letters ended with an expression of Commonwealth’s willingness to reevaluate its denial of coverage in the event the Karls provided proof of a covered loss. As we have
 
 *875
 
 already discussed, an insurer does not impliedly waive coverage defenses it fails to mention when it denies a claim.
 
 (Waller
 
 v.
 
 Truck Ins. Exchange, Inc., supra,
 
 11 Cal.4th at p. 31.) We hold as a matter of law under the
 
 Waller
 
 doctrine that Commonwealth’s failure to assert lack of proof of loss as a coverage defense in its January 28 letter did not constitute an implied waiver of its right to assert that defense in its February 8 letter. A holding to the contrary would be “. . . inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed.”
 
 (id.
 
 at p. 33.)
 

 V
 

 The Karls’ Contention the Court Improperly Denied Their Motion for Summary Adjudication Is
 
 Moot*
 

 VI
 

 Our Decision in Karl I Remains the Law of the Case
 

 Finally, the Karls assert that public policy considerations warrant a reconsideration of our decision in
 
 Karl I.
 
 In essence, they urge us to abandon
 
 Karl I
 
 and adopt the method for determining an insured lender’s loss set forth in
 
 Lawrence
 
 v.
 
 Chicago Title Ins. Co., supra,
 
 192 Cal.App.3d 70, which is a decision by the First Appellate District, Division Three.
 

 The Karls contend our decision in
 
 Karl I
 
 encourages insurance litigation because title insurers and their insureds are unlikely to agree on the fair market value of the security property on the date of a foreclosure sale. We disagree. Litigation is costly for both the insured lender and the insurer, and we are aware of no empirical data which would substantiate the Karls’ assertion that the “fair market value as of foreclosure” rule we adopted in
 
 Karl I
 
 has or will lead to increased insurance litigation or unduly increase the cost to insured lenders of resolving claims under their title policies. We affirm our decision in
 
 Karl I,
 
 which remains the law of the case.
 

 Commonwealth’s Appeal
 
 *
 

 
 *876
 
 Disposition
 

 The judgment is affirmed.
 

 Kremer, P. J., and Huffman, J., concurred.
 

 The petition of plaintiffs and appellants for review by the Supreme Court was denied March 25, 1998.
 

 See footnote,
 
 ante,
 
 page 858.
 

 See footnote,
 
 ante,
 
 page 858.
 

 [1]
 

 All statutory references are to the Code of Civil Procedure unless otherwise specified.
 

 [2]
 

 See conditions and stipulations, section 2, subdivision (a)(ii).
 

 [3]
 

 The Karls argued their out-of-pocket loss of $34,113.72 ($221,690.52 minus $187,576.80) excluded the value of the time and effort they expended renovating the property.
 

 [4]
 

 The Karls asserted that the secured promissory note they held called for payment in cash, they had not wanted to become owners of the security property, and the cash or liquidated value of the property should be determined by subtracting the reasonable costs of liquidation (i.e., the standard costs of sale) from the fair market value of the property at the time of the foreclosure sale.
 

 [5]
 

 We note the Karls assert in their appellants’ opening brief that their expert, Mr. Johnson, “opined that the value of the property was approximately $600,000.” Although the Karls direct our attention to the last page of Mr. Johnson’s appraisal report which was marked for identification as trial exhibit No. 69, this exhibit is not before us in the appellate record.
 

 [6]
 

 The sum of $695,062.69 was apparently calculated as follows:
 
 Amount secured by the Karls’ note and deed of trust
 

 Karls’ foreclosure credit bid $218,599.84 Operating deficit 3,090.68
 
 Amount of senior lien\
 
 Coast’s first trust deed 465,248.59 Lien for pre-1989/1990 taxes 8,123.58 Total: $695,062.69
 

 The Karls’ credit bid in the amount of $218,599.84 included all principal and interest, late charges, attorney’s fees, and foreclosure expenses that could then be added to their note and deed of trust, including all moneys they advanced to Coast (the holder of the first trust deed obligation) to bring Coast’s senior obligation current, including the sum of $26,241.69 which the Karls paid to Coast to reimburse Coast for its earlier payment of the tax lien.
 

 [7]
 

 Section 998, subdivision (c), provides in part: “If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his or her costs and shall pay the defendant’s costs from the time of the offer.... In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant’s costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the defendant.”
 

 *
 

 See footnote,
 
 ante,
 
 page 858.
 

 [9]
 

 The jury found the fair market value of the property was $714,993 on November 28,1989, the date of the foreclosure sale at which the Karls acquired the property by means of their credit bid. Subtracting 5 percent from this amount ($35,750) to deduct the stipulated reasonable cost of selling the property would yield a liquidated “cash equivalent” value of $679,243, which is less than the stipulated total secured indebtedness of $695,062.69 as of the foreclosure sale date.
 

 [10]
 

 The Karls cite the following sections of the California Uniform Commercial Code: sections 2703, subdivision (d), 2706, subdivision (1), and 2710. These statutes govern the remedies available to sellers of goods when the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery. The Karls rely principally on section 2710 (“Seller’s Incidental Damages”), which provides: “Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyers’ breach, in connection with return or resale of the goods or otherwise
 
 *872
 
 resulting from the breach.” Section 2710 by its own terms applies only to the return or resale of goods, not real property. The term “seller” as used in division 2 of the California Uniform Commercial Code is expressly defined to mean “a person who sells or contracts to sell goods.” (Cal. U. Com. Code, § 2103, subd. (l)(d).) The term “goods” is defined as “all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Division 8) and things in action. . . .”
 
 (Id.,
 
 § 2105, subd. 1.)
 

 [12]
 

 The
 
 McLaughlin
 
 court held that “an insurance company which relies on specified grounds for denying a claim thereby waives the right to rely in a subsequent litigation on any other grounds which a reasonable investigation would have uncovered.”
 
 (McLaughlin
 
 v.
 
 Connecticut General Life Ins. Co., supra,
 
 565 F.Supp. at p. 451.)
 

 [13]
 

 Commonwealth’s February 8,1990, letter states in part: “Finally, even if your claim was now potentially a covered matter, which is expressly denied for the reasons set forth in this letter and in my letter of January 23, no proof of loss has been submitted to this company. . . .”